Brown, A.C.J.
¶1 — Life Designs Ranch Inc. appeals the summary judgment dismissal of its defamation, tortious interference with a business expectancy, and invasion of privacy (false light) claims against Michael Sommer. Life Designs contends the trial court erred when it concluded Life Designs had failed to establish its legal claims as a matter of law. We disagree with Life Designs and affirm.
FACTS
¶2 Life Designs, owned by Vince and Bobbie Barranco, is a substance abuse aftercare program for young adults operating from Cusick, Washington, with following optional transition housing in Spokane. Clients attend Narcotics Anonymous/Alcoholics Anonymous meetings at off-site locations three times a week as part of the program. The six-month Cusick program costs clients $52,200 plus a $1,200 initial interview fee. The Spokane transitional program costs an additional $12,000.
¶3 Clay Garrett, formerly Life Designs’ admissions director, developed relationships with educational consultants hired by the families of prospective clients to guide them in program selection. The educational consultants typically narrow the prospective client’s focus to three recommended programs. Mr. Garrett updated Life Designs’ website to attract more clients. He often gave educational consultants and prospective clients Life Designs’ website information so they could learn more about the program.
¶4 In 2012, Mr. Sommer contracted to send his son to Life Designs. Mr. Sommer later disputed Life Designs’ billings. Mr. Sommer e-mailed Mr. Barranco:
Please review your contract again. It specifically states that any partial months are billed at full and the last month is not *326 refundable. I think you are in a highly indefensible position. The 26K was put into brackets to show that was the amount we were at THE MOST liable for, not the least. I am willing to get legal with this. Are you? I would hope that the most important thing to you is your reputation. We all know how easily reputations can be destroyed, without the legal system even getting involved. But I would go both routes if I have to. You are wrong on all fronts. Please reconsider before we find it necessary to proceed.
Clerk’s Papers (CP) at 257.
¶5 Mr. Sommer contacted one of Life Designs’ referral sources, Chad Balagna, who worked at a preliminary treatment program. According to Mr. Sommer, he told Mr. Balagna he should “reconsider if he was going to recommend people there so his own reputation would be protected.” CP at 243. It is unclear if Mr. Balagna is considered an educational consultant. Additionally, Mr. Sommer unsuccessfully complained to the Better Business Bureau. He registered www.lifedesignsranchinc.com, a domain name similar to Life Designs’ actual domain name, www.lifedesignsinc.com. Mr. Sommer uploaded and published allegedly defamatory content onto his website, partly including:
• The problems with this organization are numerous. Life Designs Ranch claims to help you pursue your life’s passions. That is only true if your life passion fits into what the other 11 prisoners and their wardens consider their life passion.
• Therapeutic environment??? Only for the staff and the owner, Vince Barranco, who finds that charging 12 young adults $8000 to $9000 a months [sic] for food and housing permits him to pursue his life passions since he really doesn’t have to work and has free labor to increase the value of his property.
• What you get ... A visual experience of pine trees, dead pine trees, falling down pine trees, disintegrated pine trees, and more pine trees. River, can’t be seen. Mountains, can’t *327 be seen. Civilization, can’t be seen. But there are pine trees!!!!!
• What you get... 2 or 3 twelve step meetings a week in a very small western Washington community where the only young adults in attendance are those from Life Designs ranch.
• You should go to Life Designs if: . . . You believe that it takes no education or experience with substance abuse, or compassion for the young adult who is recovering from a substance addiction to help them become the person they want to be.
CP at 248-51. The “About Us” section on Mr. Sommer’s website partly specified, “We are here to try to protect people from the financial and emotional distress that comes with attending Life Designs Ranch.” CP at 251. It concluded, “Healing is not done and seems to be very limited in it’s [sic] attempt. Keep your money, go somewhere else . . . .” Id. (emphasis added). The website also included a link to Human Earth Animal Liberation’s (HEAL) preexisting website alleging Life Designs is run like a cult, illegally exploits student labor, and employs a staff member who worked at another camp when a young boy died.
¶6 Life Designs sued Mr. Sommer for defamation, intrusion, false light, and interference with business expectancy based on later business losses. After the trial court dismissed its claims at summary judgment, Life Designs appealed.
STANDARD OF REVIEW
¶7 We review summary judgment orders de novo, engaging in the same inquiry as the trial court. Mohr v. Grant, 153 Wn.2d 812, 821, 108 P.3d 768 (2005) (plurality opinion). Summary judgment is appropriate if the evidence, when viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law. *328 CR 56(c). “[C]onstruing the evidence in the light most favorable to the nonmoving party, the court asks whether a reasonable jury could find in favor of that party.” Herron v. KING Broad. Co., 112 Wn.2d 762, 767-68, 776 P.2d 98 (1989). In defamation cases, summary judgment plays an important role: “ ‘Serious problems regarding the exercise of free speech and free press guaranteed by the First Amendment are raised if unwarranted lawsuits are allowed to proceed to trial. The chilling effect of the pendency of such litigation can itself be sufficient to curtail the exercise of these freedoms.’” Mark v. Seattle Times, 96 Wn.2d 473, 485, 635 P.2d 1081 (1981) (quoting Tait v. KING Broad. Co., 1 Wn. App. 250, 255, 460 P.2d 307 (1969)).
ANALYSIS
A. Defamation Per Se
¶8 The issue is whether the trial court erred in failing to find, as a matter of law, Mr. Sommer’s website was defamatory per se. Life Designs contends reasonable minds could solely conclude the false content on Mr. Sommer’s website exposed it to hatred, contempt, ridicule, and obloquy; deprived it of public confidence; and injured its business.
 ¶9 “Whether a given communication constitutes defamation per se may be either a question of law or a question of fact.” Maison de Fr., Ltd. v. Mais Oui!, Inc., 126 Wn. App. 34, 43, 108 P.3d 787 (2005). A publication is defamatory per se (actionable without proof of special damages) if it “(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office.” Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters, 100 Wn.2d 343, 353, 670 P.2d 240 (1983). A jury normally decides what is defamatory per se:
“Where the definition of what is libelous per se goes far beyond the specifics of a charge of crime, or of unchastity in a woman, *329 into the more nebulous area of what exposes a person to hatred, contempt, ridicule or obloquy, or deprives him of public confidence or social intercourse, the matter of what constitutes libel per se becomes, in many instances, a question of fact for the jury.”
Id. at 354 (quoting Purvis v. Bremer’s, Inc., 54 Wn.2d 743, 752, 344 P.2d 705 (1959)).
¶10 Life Designs argues Mr. Sommer’s website directly attacks its recovery program business by denigrating its therapeutic environment and the staff’s education, experience, and compassion. But the website statements do not rise to the level of “extreme” needed to constitute defamation per se as a matter of law. The criticized statements are similar to those seen in Caruso, dealing with “the rather vague areas of public confidence, injury to business, etc.” Id. at 353.
¶11 In Caruso, an article was printed in a weekly paper mailed to union members. Id. at 346. The article urged readers to avoid patronizing a carpet business because the business harassed laborers who, due to construction, parked at the business to make deliveries nearby. Id. The article further explained despite the laborers’ willingness to move the equipment, the business still impounded the equipment. Id. This article was printed four times. Id. at 346-47. After its publication, people called the business, telling the owner they would not shop there. Id. at 347. Other callers used various derogatory and profane terms to refer to the owner. Id. Sales dropped sharply. Id. The court held the trial court improperly instructed the jury when it told the jury if the jury found the article was false and defamatory it was libelous per se. Id. at 353-54. Whether the article was defamatory per se was for the jury to decide. Id.
¶12 Similarly, Mr. Sommer’s website warned potential clients away from Life Designs. Life Designs’ business declined shortly after publication. But unlike in Caruso, there were no threatening phone calls, nor were there calls *330 where people said they would not send their family member/client to Life Designs. Given Caruso, we conclude the less severe publication here cannot be defamation per se as a matter of law.
B. Defamation
¶13 The issue is whether the trial court erred in dismissing Life Designs’ defamation claim. Life Designs contends (1) the contents of Mr. Sommer’s website are actionable statements of false fact resulting in damage to Life Designs and (2) Mr. Sommer republished allegedly defamatory material by hyperlinking the HEAL website.
¶14 Life Designs must raise a genuine issue of material fact as to the four elements of a prima facie defamation claim by establishing (1) Mr. Sommer’s statements were false, (2) the statements were unprivileged, (3) Mr. Sommer was at fault, and (4) the statements proximately caused damages. Alpine Indus. Computers, Inc. v. Cowles Publ’g Co., 114 Wn. App. 371, 378, 57 P.3d 1178, 64 P.3d 49 (2002). Here, elements (1) and (4) are contested. “ ‘The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists.’” Id. (quoting LaMon v. Butler, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989)).
¶15 The alleged defamatory statement must be a statement of fact, not a statement of opinion. Davis v. Fred’s Appliance, Inc., 171 Wn. App. 348, 365, 287 P.3d 51 (2012). As the line between fact and opinion “is sometimes blurry,” we consider the following factors to determine whether a statement is actionable: “ ‘(1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts.’” Id. (quoting Dunlap v. Wayne, 105 Wn.2d 529, 539, 716 P.2d 842 (1986)). Regarding the first factor, the Dunlap court noted statements expressing *331 opinion are found more often in certain contexts. Dunlap, 105 Wn.2d at 539. “The court should consider the entire communication and note whether the speaker qualified the defamatory statement with cautionary ‘terms of appar-ency.’” Id. (quoting Info. Control Corp. v. Genesis One Computer Corp., 611 F.2d 781, 784 (9th Cir. 1980)).
¶16 All allegedly defamatory statements were published on Mr. Sommer’s website, the medium. In this realm, a dearth of Washington defamation law exists. While other jurisdictions have found statements on similar “spoof” websites can survive a motion for summary judgment or a motion to dismiss, no case has held the existence of such a “spoof” website automatically means the statements on the website are actionable. See Taylor Bldg. Corp. of Am. v. Benfield, 507 F. Supp. 2d 832, 838-40 (S.D. Ohio 2007) (individually analyzing statements on a “spoof” website to determine whether they are actionable); Winer v. Senior Living Guide, Inc., No. 12-934, 2013 WL 1217582, 2013 U.S. Dist. LEXIS 44371 (W.D. Pa. Jan. 17, 2013) (court order) (denying motion to dismiss where the “spoof” website contained untrue factual statements and falsely indicated it was the plaintiff’s official website).
¶17 Mr. Sommer did not attempt to pass his website off as Life Designs’ official website; the “About Us” section is clear, using “seems” as a word of apparency. Dunlap, 105 Wn.2d at 539; CP at 251. Thus the website suggested opinions, not facts. Furthermore, Mr. Sommer’s website did provide a hyperlink to Life Designs’ official website and expressly said that the link was to “the website for Life Designs Ranch.” CP at 250. From a policy standpoint, allowing businesses to sue any unhappy consumer for what they posted online for defamation would stifle freedom of speech. The Internet is a medium where statements expressing opinions in the context of reviewing businesses and services are often found. The medium and context of Mr. Sommer’s website denotes it is opining about the quality of Life Designs’ business, especially when looked at in relation to the other two factors discussed next.
*332 ¶18 For the second factor, courts should consider “whether the audience expected the speaker to use exaggeration, rhetoric, or hyperbole.” Dunlap, 105 Wn.2d at 539. Here, the audience was the people researching Life Designs. Online search engines retrieved many results for Life Designs; the first result was Life Designs’ official website, the fourth result was Mr. Sommer’s website, and the fifth result was the HEAL website. The blurb describing Mr. Sommer’s website read, “Thinking about going to or sending someone you love to Life Designs Ranch?? Read this first.” CP at 60. This language signaled this was a review and not the official website of Life Designs.
 ¶19 The third factor is “perhaps [the] most crucial,” as “[arguments for actionability disappear when the audience members know the facts underlying an assertion and can judge the truthfulness of the allegedly defamatory statements themselves.” Dunlap, 105 Wn.2d at 539-40; see Davis, 171 Wn. App. at 366 (stating the third factor “addresses whether a listener unknown to the plaintiff can judge the truthfulness of the statement”). “Whether a statement is one of fact or opinion is a question of law unless the statement could only be characterized as either fact or opinion.” Davis, 171 Wn. App. at 365. Life Designs discusses three statements in its briefing.
¶20 The first criticized statement is: “What you get... 2 or 3 twelve step meetings a week in a very small western Washington community where the only young adults in attendance are those from Life Designs ranch.” CP at 248. While Mr. Sommer incorrectly described Life Designs as being located in western Washington, this statement was not based on undisclosed facts. Rather, Life Designs’ official website states it is located in Cusick, Washington, which is on the eastern side of the state.
¶21 The second statement is: “What you get... A visual experience of pine trees, dead pine trees, falling down pine trees, disintegrated pine trees, and more pine trees. River, can’t be seen. Mountains, can’t be seen. Civilization, can’t be *333 seen. But there are pine trees!!!!!” CP at 248. On its website, Life Designs disclosed it is located “on 30 acres overlooking the Pend O’reille River on the international Selkirk Scenic Loop” and the “area boasts a reputation for one of the most undiscovered recreational areas in the northwest.” Life Designs Ranch, http://www.lifedesignsinc.com (last visited Sept. 9, 2015). The website shows pictures of clients in Life Designs’ natural setting. Id.
¶22 The third statement is: “Who Should Go? You should go to Life Designs if:... You believe that it takes no education or experience with substance abuse, or compassion for the young adult who is recovering from a substance addiction to help them become the person they want to be.” CP at 249. Again, this statement is based on disclosed facts. Life Designs’ website discusses the experience and education of its staff. While the compassion of the staff is not directly addressed on Life Designs’ website, compassion is a subjective determination and is thus opinion.
¶23 Each Dunlap factor weighs in Mr. Sommer’s favor. Given all, Mr. Sommer’s statements were non-actionable as defamation. Even if actionable, Life Designs fails to make a sufficient showing Mr. Sommer’s statements proximately caused its damages.[1]
*334 ¶24 The sparse evidence shows (1) a decline in referrals following publication of Mr. Sommer’s website despite an increase in traffic to Life Designs’ official website, (2) some hearsay by Mr. Garrett about an interaction between Mr. Sommer and Mr. Balagna regarding not making referrals to Life Designs, and (3) no other apparent changes accounting for the referral decline. Mr. Garrett’s declaration opining Mr. Sommer’s website caused the decline in referrals is conclusory. Mr. Garrett limited his analysis to Life Designs’ official website. No evidence shows anyone who visited Life Designs’ website visited or was influenced by Mr. Sommer’s website. Life Designs has not referred to or produced anyone who did not choose Life Designs because of Mr. Sommer’s website. And while Life Designs can show Mr. Sommer talked to Mr. Balagna about not referring anyone to Life Designs, no evidence shows Mr. Balagna took Mr. Sommer’s advice and stopped referring clients.
 ¶25 Mr. Sommer argues coincidence is not proof of causation. See Anica v. Wal-Mart Stores, Inc., 120 Wn. App. 481, 489, 84 P.3d 1231 (2004) (stating employee’s argument that timing of her termination gave rise to a reasonable inference of unlawful discrimination relied on a logical fallacy—“after this, therefore because of this”). Life Designs cites to Borden v. City of Olympia, 113 Wn. App. 359, 53 P.3d 1020 (2002), to show coincidence in timing can give rise to an inference the result was the proximate cause of the action. There are two defects in Life Designs’ analogy. First, Borden was not a defamation case. In defamation cases, it has been held in a summary judgment context, absent a privileged defendant, a private individual must prove negligence by a preponderance of the evidence. Momah v. Bharti, 144 Wn. App. 731, 742, 182 P.3d 455 (2008); see Mohr, 153 Wn.2d at 822. Second, the evidence *335 used regarding coincidence in timing was quite different. In Borden, flooding started the first winter after the drainage project was completed and recurred each winter for several years. Borden, 113 Wn. App. at 372. The flooding subsided when another drainage facility channelled water out of the area. Id. The evidence submitted by Life Designs does not meet the preponderance of the evidence standard.
¶26 Next, Life Designs contends publishing the hyperlink to an allegedly defamatory website alone constitutes republication of that defamatory content to third persons reading Mr. Sommer’s website. No Washington case addresses this contention.
¶27 Washington has adopted the single publication rule, which “ ‘states that any one edition of a book or newspaper, or any one radio or television broadcast, is a single publication.’” Momah, 144 Wn. App. at 752 (quoting Herron v. KING Broad. Co., 109 Wn.2d 514, 521, 746 P.2d 295 (1987), adhered to on recons., 112 Wn.2d 762). Momah is the sole Washington case exploring application of this rule to the Internet. There, a newspaper published comments attributed to the defendant. Id. at 737. Another article was later published, again quoting the defendant. Id. At some point, the defendant posted the newspaper articles to his website. Id. In holding the defendant republished the defamatory material, the court reiterated “ ‘the general rule that each communication of the same defamatory matter by the same defamer, whether to a new person or to the same person, is a separate and distinct publication, for which a separate cause of action arises.’” Id. at 753 (quoting Restatement (Second) of Torts § 577A cmt. a (Am. Law Inst. 1979)). The court held the defendant made the statement two different times, once when he spoke to the newspaper and once when he posted the articles on his website. Id. The two publications were aimed at different audiences. Id. The court found the situation did not differ from a newscast reading the same copy at 5:30 p.m. and 11:00 p.m. Id.
 ¶28 While no Washington law is directly on point, a federal court grappling with this same issue used *336 Washington law to hold “a mere reference or URL [uniform resource locator] is not a publication of the contents of the materials referred to.” United States ex rel. Klein v. Omeros Corp., 897 F. Supp. 2d 1058, 1074 (W.D. Wash. 2012). The Klein court distinguished relevant Washington case law, including Momah, by stating that “a finding of republication hinged on the defendant’s communication of the contents of the original, allegedly defamatory statements.” Id. at 1073. Because the defendant in Klein merely provided a URL to such statements, no republication of the contents existed. Id.
¶29 Other courts considering the issue are in accord with Klein. In Salyer v. Southern Poverty Law Center, Inc., 701 F. Supp. 2d 912, 916 (W.D. Ky. 2009), the court observed:
It appears that the common thread of traditional republication is that it presents the material, in its entirety, before a new audience. A mere reference to a previously published article does not do that. While it may call the existence of the article to the attention of a new audience, it does not present the defamatory contents of the article to that audience. Therefore, a reference, without more, is not properly a republication.
(Footnote omitted.) Because a hyperlink is more like a reference than a separate publication, “[m]aking access to the referenced article easier does not appear to warrant a different conclusion from the analysis of a basic reference.” Id. at 917; see also In re Phila. Newspapers, LLC, 690 F.3d 161, 175 (3d Cir. 2012) (holding “though a link and reference may bring readers’ attention to the existence of an article, they do not republish the article”).
¶30 We are persuaded by Klein and Salyer. We reason a URL is not qualitatively different from a mere reference. Therefore, we hold Mr. Sommer did not republish allegedly defamatory material when he posted on his website: “For more info click or cut and paste the link below http:// www.heal-online.org/lifedesigns.htm.” CP at 249.
*337 C. Tortious Interference with a Business Expectancy
¶31 The issue is whether the trial court erred in dismissing Life Designs’ claim for tortious interference with a business expectancy. The five elements of a tortious interference with a business expectancy are “(1) the existence of a valid ... business expectancy; (2) that defendants had knowledge of that [expectancy]; (3) an intentional interference inducing or causing a breach or termination of the . . . expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage.” Leingang v. Pierce County Med. Bureau, 131 Wn.2d 133, 157, 930 P.2d 288 (1997). The first, third, fourth, and fifth elements are at issue here.
¶32 “A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value.” Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc., 114 Wn. App. 151, 158, 52 P.3d 30 (2002). A plaintiff must show future business opportunities “are a reasonable expectation and not merely wishful thinking,” but certainty of proof is not needed. Caruso v. Local Union No. 690 of Int’l Bhd. of Teamsters, 33 Wn. App. 201, 208, 653 P.2d 638 (1982), rev’d on other grounds, 100 Wn.2d 343. Life Designs used its historical referral and enrollment records to demonstrate it could reasonably (1) expect a certain number of referrals each quarter and (2) successfully enroll a specific percentage of those referrals as clients. Thus, Life Designs raised a prima facie business expectancy.
¶33 Next, interference with a business expectancy is intentional “ ‘if the actor desires to bring it about or if he knows that the interference is certain or substantially certain to occur as a result of his action.’” Newton Ins. Agency & Brokerage, Inc., 114 Wn. App. at 158 (internal quotation marks omitted) (quoting Restatement (Second) of Torts § 766B cmt. d). Looking at the evidence in the light *338 most favorable to Life Designs, Mr. Sommer intentionally interfered with a business expectancy. Mr. Sommer acquired a domain name similar to that of Life Designs’ official website because he wanted people to see his website when searching for Life Designs. Mr. Sommer wanted people to research and question Life Designs’ program. Mr. Sommer admitted telling Mr. Balagna he should not refer clients to Life Designs.
¶34 In evaluating the fourth element, a plaintiff must establish the intentional interference was wrongful. Pleas v. City of Seattle, 112 Wn.2d 794, 804, 774 P.2d 1158 (1989). Interference is wrongful if it is done for an improper purpose or by improper means. Id. In Pleas, the city of Seattle intentionally stalled development of a high-rise apartment complex. The improper motive was a desire to curry favor with the active and influential opponents of the project; the improper means was the city’s arbitrary refusal to grant necessary permits. Id. at 804-05. The means used by Mr. Sommer, the Internet website, was not improper. But looking at the evidence in the light most favorable to Life Designs, a genuine issue of material fact exists as to whether Mr. Sommer acted with an improper purpose as he threatened to destroy Life Designs’ reputation in an e-mail.
¶35 Decisive is the fifth element. Life Designs fails to show resultant damage to its business expectancy. The trial court did not err in dismissing this claim because Life Designs’ conclusory claim of injury to reputation lacks evidentiary support. No client, potential client, or referral source submitted an affidavit establishing they can no longer trust Life Designs or did not choose Life Designs because of Mr. Sommer’s website.
D. False Light
¶36 The issue is whether the trial court erred in dismissing Life Designs’ false light claim. Life Designs contends Mr. Sommer’s website placed the Barrancos in a false light *339 because the contents of the website created a false impression about the way in which the Barrancos operated their business.
¶37 “The protectable interest in privacy is generally held to involve four distinct types of invasion: intrusion, disclosure, false light and appropriation.” Eastwood v. Cascade Broad. Co., 106 Wn.2d 466, 469, 722 P.2d 1295 (1986). Actions based on invasion of privacy are separate and distinct from those based on defamation. Id. False light claims differ from defamation claims because false light claims focus on compensation for mental suffering rather than reputation. Id. at 471. Washington follows the Restatement (Second) of Torts. Hearst Corp. v. Hoppe, 90 Wn.2d 123, 135, 580 P.2d 246 (1978) (establishing Restatement (Second) of Torts § 652D (Am. Law Inst. 1977) sets out the guiding principles for invasion of privacy actions).
¶38 Only a living individual whose privacy has been invaded can maintain an action for invasion of privacy. Restatement (Second) of Torts § 6521. Comment c to Restatement (Second) of Torts § 6521 states a corporation has no personal right of privacy and thus has no cause of action for invasion of privacy. Thus, Life Designs’ false light claim fails. But the Barrancos individually sued for false light and do not face the corporate exclusion.
A false light claim arises when someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed.
Eastwood, 106 Wn.2d at 470-71. While the Barrancos’ false light claim may have merit, all evidence in relation to damages is in reference to Life Designs. Ms. Barranco was not mentioned by name on Mr. Sommer’s website; her claim is derivative of Mr. Barranco’s claim. Mr. Barranco did not state he personally suffered damage to his reputation or any emotional suffering; rather, all his statements refer to *340 the damages suffered by his business, Life Designs. Thus, the trial court did not err in dismissing the false light claims.
¶39 Affirmed.
Korsmo, J., concurs.

 Mr. Sommer contends Mr. Garrett’s declaration is inadmissible as an expert opinion because (1) Mr. Garrett was not qualified to offer the opinions contained therein, thus (2) much of the declaration was inadmissible conclusory allegations of a lay witness. We cannot consider inadmissible evidence when ruling on a motion for summary judgment. Davis, 171 Wn. App. at 357. We review the admissibility of evidence in summary judgment proceedings de novo. Id. ER 702 states, “If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.’’ Under this rule, we engage in a two-part inquiry: “(1) does the witness qualify as an expert; and (2) would the witness’s testimony be helpful to the trier of fact.’’ State v. Guilliot, 106 Wn. App. 355, 363, 22 P.3d 1266 (2001). The focus of our inquiry is on Mr. Garrett’s qualifications. “[I]n the appropriate context, ‘[plractical experience is sufficient to qualify a witness as an expert.’ ’’ State v. McPherson, 111 Wn. App. 747, 762, 46 P.3d 284 (2002) (second alteration in original) (quoting State v. Ortiz, 119 Wn.2d 294, 310, 831 P.2d 1060 (1992)). Once a witness is qualified as an expert, any *334 deficiencies in that qualification go to the weight, not the admissibility, of the testimony. Keegan v. Grant County Pub. Util. Dist. No. 2, 34 Wn. App. 274, 283, 661 P.2d 146 (1983). Mr. Garrett’s experience in wilderness programs, computers (including building a website), and business development render his testimony admissible under ER 702. Any deficiencies in his testimony thus would go to the weight.