FILED
COURT OF APPEALS DIV 1
STATE OF WASHINGTON

2018 DEC -3 AM 9: 22

## IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

BLUZEBRA TECHNOLOGIES, a
division of COPIERS NORTHWEST,
INC., a Washington corporation,

        Respondent,

v.

YATES, WOOD & MACDONALD,
INC., a Washington corporation,

        Appellant.

No. 77106-0-I

DIVISION ONE

UNPUBLISHED OPINION

Filed: December 3, 2018

LEACH, J. — Yates, Wood & MacDonald Inc. (Yates) appeals a summary judgment granting four breach of contract claims of BluZebra Technologies (BZ) and dismissing Yates's counterclaims against BZ. BZ claims that Yates did not pay a number of invoices for goods and services authorized by the copier program agreement, the master client services agreement, the telephone lease, and the server lease. Yates does not contest this. And Yates does not present sufficient evidence to create a genuine issue of material fact about BZ's claims or its counterclaims. We affirm.

### FACTS

Yates is a property management company and commercial real estate firm. BZ, a division of Copiers Northwest, sells, leases, and maintains copier

machines, telecommunications equipment, and related products and services. Yates has had an ongoing business relationship with BZ since the 1980s. This appeal involves four agreements between Yates and BZ: the copier program agreement, the master client services agreement, the telephone lease, and the server lease. The telephone and server leases state that in addition to their respective terms, they are governed by the master client services agreement.

In February 2016, Nancy Darlington sold Yates to Mark Holmes. On March 18, 2016, Holmes notified BZ that Yates was terminating its contractual relationship with BZ for network services. On April 27, 2016, BZ representative Mark Fisher e-mailed Holmes to confirm that April 28, 2016, would be the last day that BZ would provide services to Yates. Holmes responded,

> There are many open items that even with our involvement don't seem to be answered or resolved by the BZT Team. In addition, there is some question as to end dates.
>
> Rather than asking us "are we good" you should be telling us whether we are good or not. You are the Network people, not us. We are merely taking it over when it is ready to be taken over. My understanding is there are still areas where the BZT Team does not understand what is occurring and how things are being accessed and/or controlled.

Fisher responded,

> We've answered every question that you've asked, and provided you with all of the network details needed to run the network. Attached is an email correspondence between Josh Weiland and your IT [information technology] contact David Berge. As you can see, there is a list of network details and thoroughly

answered questions. This information should be sufficient for your IT team to manage the network.

We're not exactly sure what you're asking of us. Is there some missing piece that is preventing your people from taking over responsibility?

Holmes described his expectations in deposition testimony:

Q. Exhibit 19 is an e-mail chain. Mark Fisher sends the first e-mail to you and copies a couple people. You respond.

A. Yeah. I even said here—this worried me too. He's like, hey, effective this date, we're going to cut off your service.

I'm like jeez. Well, you know, we paid you hundreds of thousands of dollars over decades. I would think you'd work with us to kind of get us to where we need to go.

That's why I responded back. Hey, you know, I'm not a technology guy. Our IT guy's down in Portland. It's 20 days, 20 business days.

After this, I mean, I don't think their technology person, who I don't think ever even worked on the system, got in contact with David.

David asked him a whole series of questions, and he didn't know. We had to bring our people in to take pictures and tell David what we had.

That was communicated to their technology person, and then he started getting bits and pieces of this. Meanwhile[,] while this was going on and we were wondering you know, jeez, I hope they don't try to cut over, I was getting e-mails from them going, hey, are we all good?

I'm like, well, don't—you're the IT. You know, you've got— you've had the system and received hundreds of thousands of dollars. You know, you tell us if we're good.

Q. Well, you chose to terminate those services; right?

A.    Yeah.

Q.    You essentially fired them from providing these services. You expect them to continue to provide the services after you fired them?

A.    Well, not to provide the services, but to help us transition.

Q.    And you don't think they did that?

A.    No.  In fact, I think they said, well, you know, we're going to have to—if it goes over the date, we're going to have to charge you. Really?

That's what kind of got me.  It's like really?  After all this? It just—it just—given everything I knew, it was just—it just was very unjust.

Q.    So the fact that they wanted more money to stay on as your service provider after you had fired them was an unjust request on their part?

A.    Given the length of time, the money we had spent and the problems that we had put up with with the company, yes.  I think for them to say that if you don't get cut over by a certain date, it wasn't—you know, they were in charge of telling us what we had and what we could cut over.

For them to say we're going to have to bill you, like to give us an ultimatum, yes, in my view was an unjust thing to do.

        . . . .

Q.    What should they have done?

A.    Well, I think we've been over this.

Q.    I thought I heard you say you expected them to work for free until you were satisfied that you had everything you needed to take over for them.

A.    Well, not until I was satisfied.    There's a reasonableness here.    I mean, a week or two after they delayed the transition a week or two, yes.    I think that's fair.

I mean, did I expect them to stay on for four years and not get paid?    No.    If that's what you're kind of trying to paint me out as that type of person, no.

Q.    I'm just trying to understand what your expectations were.    It was a week or two?

A.    What?

Q.    Your expectations were maybe a week or two for—

A.    Yeah, or however long.    You know, we'd been with them for decades, paid them hundreds of thousands of dollars.

(Emphasis added.)

In March 2016, Yates stopped paying BZ's invoices.    Yates does not dispute this.    Holmes testified, "[I]f [BZ] billed this and records show they billed it and records showed we haven't paid it, then it's been billed and it has not been paid."

In October 2016, BZ sued Yates, claiming breach of the copier program agreement and the master client services agreement, including the telephone lease and the server lease.    Yates asserted as affirmative defenses accord and satisfaction, lack of an enforceable contract, and laches.    Yates also alleged a number of counterclaims.    The trial court granted BZ summary judgment and dismissed with prejudice Yates's affirmative defenses and counterclaims.    It awarded BZ about $40,000 in damages and $25,845 in attorney fees and costs.

No. 77106-0-I / 6

Yates appeals the trial court's grant of summary judgment to BZ and the court's dismissal of its counterclaims.

## STANDARD OF REVIEW

This court reviews summary judgment orders de novo.[1] "To survive a motion for summary judgment, [the nonmoving] party must respond to the motion with more than conclusory allegations, speculative statements, or argumentative assertions of the existence of unresolved factual issues."[2] Summary judgment is appropriate when the evidence, viewed in a light most favorable to the nonmoving party, shows no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law.[3]

"'In construing a written contract, the basic principles require that (1) the intent of the parties controls; (2) the court ascertains the intent from reading the contract as a whole; and (3) a court will not read an ambiguity into a contract that is otherwise clear and unambiguous.'"[4] A contract is ambiguous only if its terms are uncertain or are subject to more than one reasonable meaning.[5]

---

[1] Life Designs Ranch, Inc. v. Sommer, 191 Wn. App. 320, 327, 364 P.3d 129 (2015).
[2] Walker v. King County Metro, 126 Wn. App. 904, 912, 109 P.3d 836 (2005).
[3] Life Designs, 191 Wn. App. at 327.
[4] Dice v. City of Montesano, 131 Wn. App. 675, 683-84, 128 P.3d 1253 (2006) (quoting Mayer v. Pierce County Med. Bureau, Inc., 80 Wn. App. 416, 420, 909 P.2d 1323 (1995)).
[5] Dice, 131 Wn. App. at 684.

-6-

Interpretation of an unambiguous contract is a question of law this court reviews de novo.[6]

## ANALYSIS

### The Scope of This Court's Review

As a preliminary issue, BZ asks this court not to consider the original and corrected declarations Yates submitted to the trial court. These include declarations from Holmes, Darlington, Jamie Emerson, a Yates employee, and Yates's counsel, Mark Passannante. BZ claims that none of the original timely declarations stated the place of signature or that they were made under penalty of perjury under the laws of the State of Washington. Yates filed "corrected" declarations after the deadline to submit evidence to the trial court. BZ objected.

The trial court's order granting BZ summary judgment states that it reviewed the timely declarations only. While they did not comply with GR 13(a) and RCW 9A.72.085, the court also found that they did not create a genuine issue of material fact on any issue.

BZ contends that this court should not consider these declarations because of these deficiencies. It also asserts that if this court decides to consider the corrected declarations, it should not rely on the inadmissible hearsay statements and speculation in Holmes's declaration. Because the timely

---

[6] Dice, 131 Wn. App. at 684.

declarations do not create a genuine issue of material fact about any of the issues on appeal, we do not address BZ's contentions about their form and content. We do not consider the untimely corrected declarations.

### Yates's Citations to the Record

As a second preliminary issue, BZ notes that Yates did not cite to the record in violation of RAP 10.3(a), which impaired BZ's ability to respond. It asks this court to reject Yates's briefing and affirm the trial court. RAP 10.3(a) states that the appellant's brief should contain:

> (5) Statement of the Case. A fair statement of the facts and procedure relevant to the issues presented for review, without argument. Reference to the record must be included for each factual statement.

> (6) Argument. The argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record. The argument may be preceded by a summary. The court ordinarily encourages a concise statement of the standard of review as to each issue.

A reviewing court may decline to consider issues raised on appeal when the brief lacks proper references to the record.[7] BZ claims that Yates states many facts with no citation to the record and many citations that it provides are ambiguous or inapposite to the proposition cited. Indeed, Yates does not provide

---

[7] State v. Camarillo, 54 Wn. App. 821, 829, 776 P.2d 176 (1989).

citations for a number of its statements of fact or its arguments.[8] But its citations are not so lacking that we decline to consider the issues it raises on appeal.[9]

<u>BZ's Breach of Contract Claims and Yates's Counterclaims</u>

Yates challenges the trial court's granting of summary judgment in favor of BZ and its dismissal of Yates's counterclaims. We reject these challenges.

"A breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant."[10] A party's failure to perform a contractual duty constitutes a breach.[11] And "[r]epudiation of a contract by one party may be treated by the other as a breach which will excuse the other's performance."[12] A party must prove damages with reasonable certainty or support them by competent evidence in the record.[13]

---

[8] For example, without citing to the record, Yates states that it "made all payments required under its [copier] lease in full and without discount and paid the residual value of the copier as required by the lease."

[9] See Camarillo, 54 Wn. App. at 829 ("[B]ecause the brief contains no references to the record, RAP 10.3, we decline to consider the issues it raises." (emphasis added)).

[10] Nw. Indep. Forest Mfrs. v. Dep't of Labor & Indus., 78 Wn. App. 707, 712, 899 P.2d 6 (1995).

[11] DC Farms, LLC v. Conagra Foods Lamb Weston, Inc., 179 Wn. App. 205, 230, 317 P.3d 543 (2014).

[12] CKP, Inc. v. GRS Constr. Co., 63 Wn. App. 601, 620, 821 P.2d 63 (1991).

[13] Hyde v. Wellpinit Sch. Dist. No. 49, 32 Wn. App. 465, 470, 648 P.2d 892 (1982).

Evidence of damages is sufficient if it provides a reasonable basis for estimating the loss and does not require speculation or conjecture.[14]

## A. Copier Program Agreement

Yates claims that it created a genuine issue of material fact about whether it breached the copier program agreement because the copier sales order, not the agreement, established the parties' contract. Yates counterclaims that BZ overcharged it for excess pages and failed to maintain the copier during the lease term. We disagree.

BZ's chief financial officer, John Hines, stated in his declaration that Darlington, on behalf of Yates, signed the copier sales order on December 6, 2011. This order provided that BZ would lease a copier to Yates for 60 months at a cost of $605.06 per month. This included 17,500 black-and-white pages per month and 1,800 color pages per month. Hines stated that after signing the copier sales order, Darlington signed the more detailed copier program agreement. In addition to the lease term, the monthly cost, and the number of pages included in that cost, the copier program agreement provides that BZ would charge Yates $0.0079 per page for black-and-white copies in excess of 17,500 per month and $0.059 per page for color copies in excess of 1,800 pages per month. It also stated that these charges would be metered and billed

---

[14] Interlake Porsche & Audi, Inc. v. Bucholz, 45 Wn. App. 502, 510, 728 P.2d 597 (1986).

-10-

quarterly and would be subject to annual increases of no more than seven percent.

On March 22, 2016, BZ invoiced Yates for excess copy charges of $508.22 after taxes for the three-month period of December 21, 2015, to March 20, 2016. This invoice shows that Yates made 11,331 color copies, 5,931 more than were included in the base rate. During this three-month period, the base rate was $0.077340, which included a 6.2 percent annual increase over five years. The invoice states that payment was due on April 21, 2016. Yates does not contest that it did not pay this invoice.

First, Yates counterclaims that the copier sales order and not the copier program agreement is the parties' contract. Because the sales order does not include a price for excess copies, BZ overcharged it for excess copies. So Yates does not owe BZ for any unpaid invoices. Yates relies on a provision in the copier program agreement that states, "THIS AGREEMENT IS NOT BINDING UPON [BZ] OR EFFECTIVE UNTIL AND UNLESS WE EXECUTE THIS AGREEMENT." Yates asserts that because BZ did not sign the copier sales agreement, it never became effective and the sales order controls.

BZ relies on the principle that when two contracts made by the same parties and covering the same subject matter conflict, the later contract has the

legal effect of rescinding the earlier contract.[15]    BZ claims that because undisputed evidence shows that Darlington signed the copier program agreement after the copier sales order, the copier program agreement controls. BZ, however, presented no evidence that it signed the copier program agreement as required.

But BZ's and Yates's course of performance establishes the copier program agreement as the parties' contract.   Extrinsic evidence consisting of course of performance, course of dealing, and usage of trade is admissible to add or clarify unambiguous terms.[16]   BZ presented undisputed evidence that Darlington paid the increases to the base rate for excess copies required under the copier program agreement from 2011 until she sold Yates to Holmes in 2016. Yates's and BZ's course of performance over these five years establishes the copier program agreement as the controlling agreement.   So BZ did not overcharge Yates for excess copies because the copier program agreement authorized them.

Second, Yates counterclaims that BZ breached the copier program agreement by not maintaining the copier during the lease term.   Undisputed evidence shows that in March 2016 Yates paid the remaining lease payments

---

[15] Higgins v. Stafford, 123 Wn.2d 160, 165-66, 866 P.2d 31 (1994).
[16] Morgan v. Stokely-Van Camp, Inc., 34 Wn. App. 801, 808-09, 663 P.2d 1384 (1983).

and purchased the copier. In April 2016, Yates obtained an estimate to repair the copier for $1,731 plus tax. Yates asked BZ to pay for the repair costs. BZ responded that Yates was responsible for the repairs. Yates claims that BZ's refusal to pay breached its maintenance obligation under the copier program agreement. But the copier program agreement states that BZ was "not responsible for any service, repair, or maintenance of the Equipment, and . . . not a party to any maintenance service agreement." It also states that BZ provided the copier on an "as-is" basis without any warranties. Yates does not create an issue about whether BZ breached the agreement by not providing any contractually required maintenance.

B. *Master Client Services Agreement*

Yates claims that it raised a factual question about whether it breached the "managed network services agreement." It counterclaims that BZ did not provide all contractually required services and improperly charged Yates for services after the agreement ended on September 25, 2015. We disagree.

On September 25, 2012, Yates signed a sales order for managed network services with BZ. Yates refers to this order as the "managed network services agreement." The services BZ agreed to provide included desktop remote monitoring, server remote care, antivirus, antimalware, patch management, business continuance backup solution, technology road mapping, and those

services "stated within the Statement of Work." The sales order had a term of 36 months ending September 2015.

Three days later, on September 28, 2012, Yates and BZ signed the master client services agreement. The agreement's "SCOPE OF SERVICES" provision states, in relevant part, that BZ

> agrees to assist Client with professional hosting services and advice as set forth in Schedule 1, Addendums and as set forth in one or more applicable statements of work (each, a "Statement of Work") that may be executed from time-to-time by both parties under this Agreement (collectively, the "Services"). To be effective, each Statement of Work (if any) shall reference this Agreement and, when executed by both parties, shall automatically be deemed a part of, and governed by the terms of, this Agreement.

The agreement does not state a specific term or an end date. Schedule A to this agreement is the same statement of work referenced in the sales order. It required that BZ provide additional network services, such as process consulting, software configuration, and installation and training services. E-mail correspondence between Yates and BZ establishes that BZ provided Yates network services until the negotiated termination date of April 28, 2016. BZ claims that Yates failed to pay invoices for the network services that BZ provided in March and April 2016. Yates does not dispute this. The unpaid invoices total $3,907.68 plus 18 percent annual interest.

First, Yates claims that BZ did not provide it with all the contracted for services. But Yates provides no evidence to support this claim. This claim

appears to relate to the server lease, not the master client services agreement. Holmes testified that he had expected BZ to better support Yates's transition of its network services in-house. But Yates does not say that this dissatisfaction is the basis for its claim that BZ did not provide all required services under the agreement. In addition, Yates does not show that either the master client services agreement or the statement of work required that BZ provide Yates more transition-related support than it did.

Yates also fails to support its offset claim for network service-related payments made for services provided from October 2015 to February 2016 that it did not owe because it did not contract for these services after September 2015. Yates does not dispute that it received network services after September 2015 or the value of those services.

Only the sales order for managed network services, not the master client services agreement, described September 25, 2015, as the termination date. As discussed above, both of these agreements referenced the same statement of work, which covered select network services. Yates does not identify what, if any, network services BZ provided after September 2015 were authorized by only the sales order. Also, Yates's and BZ's e-mail correspondence shows that the agreed date to terminate network services was April 28, 2016. Yates does not raise an issue of fact about whether it breached the master client services

agreement, whether BZ did not perform under this agreement, or whether Yates overpaid for any network-related services.

*C. Telephone Lease*

Yates also claims that it raised an issue about whether it breached the telephone lease because BZ did not provide "support" as required by the telephone lease. We reject this claim.

On March 28, 2013, BZ and Yates signed a 60-month rental agreement for a telephone system, including 33 phones. The lease set a rate of $665.00 per month plus applicable taxes. This rate includes a fee for "maintenance and management" of the telephone system. Yates stopped making payments with 27 months left on the lease. Yates does not dispute this. The lease provides default remedies that include payment of the full lease balance immediately with interest at the rate of 18 percent per year from the date of default until paid. BZ claims $19,359.99 in damages plus interest at 18 percent per year.

Yates counterclaims that because BZ did not provide "support" as the telephone lease required, BZ repudiated the contract, excusing Yates from its duty to pay. But, as stated above, the contract states that BZ would provide "maintenance and management." Although this provision does not include the term "support," Yates claims that BZ "made clear that their promise to provide a phone solution included 'support.'" To support its claim, Yates relies on only

Darlington's declaration stating, "When I entered into the phone agreement, I was told by the sales representative that support was included and it was part of the cost of [the] monthly management and maintenance."

Yates also asserts that because the contract does not define the terms "maintenance and management," they should be given their ordinary meaning.[17] Yates relies on a definition of "support" from whatis.techtarget.com to show that "support" can include the personal assistance vendors provide to end users for operating systems, hardware, and programs. Yates maintains that management and maintenance includes this support. We do not need to resolve the exact meaning of maintenance and management because Yates's only evidence of BZ's alleged breach is a statement by Emerson:

> Since the inception of Yates' phone lease, Yates has experienced intermittent problems with the degradation of the phone call quality and/or dropped calls. . . . BZ responded to problems by switching out phone cords, but those efforts were only moderately effective. During these requests, BZ did not indicate that resolving these problems was not part of its services to Yates. My understanding of the service provided by BluZebra in relation to the phones included directing any phone issues, errors and updates (including as the result of personnel changes) to BluZebra and that they would attempt to correct them.

However Yates labels the services that BZ provided, Emerson stated that BZ responded to telephone-related issues that Yates experienced. The fact that

---

[17] Hearst Commc'ns, Inc. v. Seattle Times Co., 154 Wn.2d 493, 504, 115 P.3d 262 (2005) ("We generally give words in a contract their ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent.").

BZ's efforts were only "moderately successful" does not excuse Yates's duty to pay. Simply put, Emerson's statement supports that BZ fulfilled its contractual duty to provide maintenance.

Yates also claims that BZ did not provide support when Yates experienced a "global phone problem" in March 2016. Yates maintains that when it e-mailed BZ asking for a support contact, a BZ representative responded that Cerium, BZ's phone vendor, did not support the ShoreTel phones that BZ provided Yates. BZ also stated that Yates purchased the phones with a one-year service plan through ShoreTel, which had expired. Yates maintains that it was not until after BZ told Yates that BZ's contractor did not support the phone system that BZ stated support was not included in the contract. Yates, however, does not identify what support BZ did not provide. Yates claims only that it experienced a "global phone problem" and does not explain how BZ failed to address any issues related to it.

Yates does not raise an issue about whether it breached the telephone lease or about its counterclaim that BZ repudiated the contract by not fulfilling its contractual duty to provide "support."

*D. Server Lease*

Yates claims that it raised an issue about whether it breached the server lease because BZ repudiated it by failing to provide Yates with information that the lease required. We disagree.

In September 2013, BZ proposed to upgrade Yates's servers. Yates chose a rental agreement with a purchase option. The server lease authorizes a rate of $542.25 plus taxes per month. On March 18, 2016, Holmes e-mailed Fisher about terminating BZ's network services and stated, "We've got about a year and a half on the Server/Vault and about three years on the phones left. No problem." But with 21 months remaining on the 48-month server lease term, Yates stopped making payments. Like the telephone lease, the server lease provides default remedies, including payment of the full lease balance immediately with interest at the rate of 18 percent per year from the date of default until paid. Yates does not contest this. BZ claims $12,324.72 plus 18 percent annual interest in damages.

Yates claims that BZ repudiated the server lease on two grounds. First, Yates asserts that BZ did not provide it with software license serial numbers until discovery. Yates contends that without this information, it could not ask Microsoft for assistance and paid $8,000 in additional staff time "during transition." Yates maintains that when it asked BZ about these licenses, BZ incorrectly stated that it

had no obligation to provide them. Yates identifies no evidence in the record that supports its claim. BZ responds that it provided the necessary software, which Yates does not contest. BZ does not address whether the contract also required it to provide Yates the software license serial numbers. But because Yates does not identify any provision in the contract requiring that BZ provide it with software license serial numbers, it does not raise an issue about whether BZ breached the contract. And because Yates does not support its claim for $8,000 in damages due to additional staff time with competent evidence, it does not create an issue about damages.

Second, Yates claims that BZ did not provide it with the password to access Yates's server and local backup data. Yates asserts that BZ repeatedly refused to provide the password. Again, it identifies no evidence in the record that supports this claim. Even if BZ breached the lease with this alleged failure to provide the password, Yates produced no evidence about any damages this breach caused. Yates does not establish a genuine issue of material fact about whether it breached the server lease or about whether BZ repudiated the lease.

### Notice

Yates also claims that BZ did not provide it proper notice of default before filing this lawsuit. The master client services agreement states that if Yates materially breaches the agreement, BZ has the right to terminate it provided that

-20-

BZ notifies Yates of the breach in writing and Yates does not cure it within 10 days after receipt of this notice. Both the telephone and server leases state that if Yates were to default by failing to pay a rental payment when due, upon written notice, BZ can declare the balance of the unpaid payments immediately due and payable and sue to recover payment.

> As stated above, in March 2016, Holmes sent BZ an e-mail stating, We've got about a year and a half on the Server/Vault and about three years on the phones left. No problem. What I was referring to when I spoke with Nathan about a service that had ended was the Managed Network Services. . . . We manage our network in-house, so that's why I gave notice on that piece.

Holmes testified that this e-mail meant that he "was aware that there was still time on the agreements" and Yates wanted to manage its network in-house. But, as discussed above, the sales order for network services and the master client services agreement refer to the same statement of work, which covers select network services. BZ could thus reasonably have interpreted Yates's e-mails as terminating the master client services agreement, including the telephone and server leases. And these agreements do not require that BZ give Yates notice if Yates terminates them. Yates failed to present evidence of a genuine issue of material fact as to whether BZ's reading of the e-mail was reasonable and excused any notice requirement.

## Attorney Fees and Costs

BZ asks that this court award it attorney fees and costs on appeal under the master client services agreement and RAP 18.1. RAP 18.1(a) allows a reviewing court to award a party reasonable attorney fees if applicable law grants a party the right to recover them and the party requests them in compliance with RAP 18.1. BZ correctly notes that RCW 4.84.330[18] makes attorney fees provisions like the one in the master client services agreement enforceable. This agreement states, "Client shall be liable for all reasonable attorneys' fees as well as costs incurred in collection of past due balances including but not limited to collection fees, filing fees and court costs." We award BZ attorney fees and costs on appeal subject to its compliance with RAP 18.1(d).

---

[18] RCW 4.84.330, in relevant part, states as follows:

In any action on a contract or lease entered into after September 21, 1977, where such contract or lease specifically provides that attorneys' fees and costs, which are incurred to enforce the provisions of such contract or lease, shall be awarded to one of the parties, the prevailing party, whether he or she is the party specified in the contract or lease or not, shall be entitled to reasonable attorneys' fees in addition to costs and necessary disbursements.

## CONCLUSION

Yates does not create a genuine issue of material fact about whether it breached the four agreements at issue, about its counterclaims, or damages. We affirm.

_Leach, J_

WE CONCUR:

_Smith, J._

_Mann, A.C.J._