# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

REGINALD PETER SAUNDERS and
ELIZABETH SAUNDERS, husband and
wife; and MICHAEL A. O'BRIEN and
MARCY L. O'BRIEN, husband and wife,

     Respondents,

      v.

VERNON I. MEYERS and VIRGINIA C.
MEYERS, husband and wife; MEYERS
REVOCABLE LIVING TRUST; JOHN
DOE and JANE DOE, trustees of the
Meyers Revocable Living Trust; and
JOHN DOE and JANE DOES,
beneficiaries of the Meyers Revocable
Living Trust,

     Appellants.

No. 68249-1-I

ORDER GRANTING
MOTION TO PUBLISH

The appellants, Vernon and Verginia Meyers et al., have filed a motion to publish. The respondents, Reginald and Elizabeth Saunders and Michael and Marcy O'Brien, have filed a response. A panel of the court has reconsidered its prior determination not to publish the opinion filed for the above entitled matter and found that it is of precedential value and should be published. Now, therefore, it is hereby

ORDERED that the written opinion filed May 28, 2013, shall be published and printed in the Washington Appellate Reports.

DATED this ____ day of _____, 2013.

_____
     Judge

COURT OF APPEALS DIV I
STATE OF WASHINGTON
FILED
2013 JUL 24 AM 11: 28



# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

REGINALD PETER SAUNDERS and ELIZABETH SAUNDERS, husband and wife; and MICHAEL A. O'BRIEN and MARCY L. O'BRIEN, husband and wife, )))) No. 68249-1-I

Respondents, ) DIVISION ONE

) PUBLISHED OPINION

v. )

VERNON I. MEYERS and VIRGINIA C. MEYERS, husband and wife; MEYERS REVOCABLE LIVING TRUST; JOHN DOE and JANE DOE, trustees of the Meyers Revocable Living Trust; and JOHN DOE and JANE DOES, beneficiaries of the Meyers Revocable Living Trust, ))))))))))

Appellants. ) FILED: May 28, 2013

)

APPELWICK, J. — The Somerset Covenants Review Committee decided the Meyerses' mature maple tree violated a restrictive covenant protecting views and required that the tree be trimmed or removed. The trial court granted summary judgment enforcing that decision. However, the CRC's decision was based upon an incorrect interpretation of the covenant and was not enforceable. We void the decision of the CRC, reverse the order of the trial court, and remand for award of costs to the Meyerses and dismissal of the action.

## FACTS

This appeal arises from a single, mature maple tree on Vernon and Virginia Meyerses' property that partially obscures the views of their uphill neighbors. The tree is approximately 70 feet tall and 60 feet wide, with a trunk nearly four feet in diameter.

In 1962, Evergreen Land Developers Inc. (Evergreen) subdivided and platted the Somerset neighborhood of Bellevue, Washington. Somerset is situated on a hillside with westerly views of Seattle, Mercer Island, Lake Washington, and the Olympic Mountains. Evergreen created the Somerset Building Committee (Building Committee) and put it in charge of reviewing building plans and enforcing Somerset's restrictive covenants ("the covenants" or "CCRs"). In 2001, by covenant amendment, the Covenants Review Committee (CRC) replaced the Building Committee, assuming its rights, powers, and authorities. The primary subject of this appeal is CCR ¶ 10:

> 10. <u>FENCES AND HEDGES</u>. . . . No trees of any type, other than those existing at the time these restrictive covenants of Somerset, Division No. 2, Somerset, Division No. 4 and Somerset, Division No. 6 are filed, shall be allowed to grow more than twenty (20) feet in height, provided they do not unnecessarily interfere with the view of another residence. The Building Committee shall be the sole judge in deciding whether there has been such interference. In case of violation, the Building Committee shall be the sole judge in deciding whether there has been such interference. In case of violation, the Building Committee shall have enforcement powers as set forth in Paragraph 1 of GENERAL PROVISION.

The CRC interpreted this provision, applied it to the Meyerses' maple tree, and ordered them to trim the tree as directed or remove it.

In 1970, the Meyerses purchased unimproved lot 117, which included the maple tree, then measuring around 70 feet tall and 30 feet wide. The Building Committee approved the Meyerses' building plans, and their home was constructed shortly thereafter.

Three years later, in 1973, Peter and Elizabeth Saunders built their home uphill from the Meyerses' existing home. In the late 1970s, 1980s, and 1990s, they asked the Meyerses to trim the maple tree. The Saunderses recalled that the Meyerses "liked

2

their tree, it was the reason they bought their house, and as far as the covenants were concerned, the tree was grandfathered."

Michael and Marcy O'Brien purchased their home uphill from the Meyerses in 1997.[1] Soon after, the O'Briens asked the Meyerses to prune minimal portions of the maple tree's lower limbs to enhance their view. The Meyerses' arborists routinely maintained the health of the tree and reduced its height from 70 feet to 63 feet in the 1990s and 2000s.

In 2006, the CRC met with Gerald Harkleroad to clarify ambiguities in the tree height covenant. Harkleroad worked as a project manager for Evergreen from 1967 to 1974.[2] During that time, he reviewed house plans and mediated homeowner disputes about interpretation and enforcement of the restrictive covenants.

Based on its meeting with Harkleroad, the CRC issued a view guideline, but did not amend the covenants. The CRC wrote that the spirit of the guideline was to preserve homeowner views the way they were when the house was built. It explained, "[T]his Guideline will not be applied in a way that would force a downhill Owner to expand or enlarge the View that existed when the relevant Main Floor Living Space was Built." (Emphasis in original.) The guideline also addressed CCR ¶ 10:

> The 20' provision means two things. First, "new" trees shall not be allowed to grow more than twenty (20) feet. Second, the twenty (20) foot height restriction does not apply to Grandfathered Trees, provided they do not unnecessarily interfere with the view of another residence. If either tree unnecessarily interferes with the view of another residence it must be trimmed to a lower height so the resulting view restoration is sufficient to prevent the tree from "unnecessarily interfering with the view of another residence."

---

[1] The O'Briens' home was constructed in 1962.

[2] Harkleroad acknowledged that he did not draft the Somerset covenants.

3

(Emphasis in original) (quoting CCR ¶ 10).

After receiving 11 formal complaints about the maple tree, the CRC investigated whether it unnecessarily interfered with views. On May 28, 2009, the CRC sent the Meyerses a letter directing them to trim the tree's canopy to 30 feet wide. The CRC wrote that the tree was approximately 70 feet tall in 1964, but was only 30 feet wide at the time. Since then, the tree's width doubled to over 60 feet wide, which the CRC concluded unnecessarily interfered with neighbors' views. The CRC explained:

> Original large trees that were already tall enough so that a neighbor did not have a particular view over the tree at the time of the covenants could continue to grow higher as long as it did not block other existing views. There would be no taking of a view since there was no pre-existing view to be taken. **However, this does not allow a tree to take away an existing view by spreading out in the horizontal plane**. This is what has happened with your tree. A tree's width can have as much impact on a neighbor's view as the tree's height.

(Emphasis in original.) The CRC noted that if trimming the tree to 30 feet wide would adversely affect the tree's health, then it should be removed.

In April 27, 2010, the CRC sent the Meyerses another decision letter requiring them to trim the height of the tree to the actual level it had been in 1967. The CRC explained that it did not address tree height in its first decision, because it did not have verifiable information regarding the height of the tree. But, based on new evidence, the CRC concluded that there used to be a view of the Olympics over the tree. The CRC's decision letter included a photo with a red line designating the height at which the tree must be trimmed.

4

When the Meyerses did not comply with the CRC's decisions, the Saunderses and O'Briens[3] sued for breach of covenant and injunctive relief in April 2011. They requested that the Meyerses be ordered to trim or remove the maple tree, pursuant to the CRC's decisions.

Both parties made cross motions for summary judgment, disputing the interpretation of CCR ¶ 10. The Meyerses also moved to strike evidence, which the trial court denied. The court subsequently granted the Saunderses' motion and denied the Meyerses' motion for summary judgment. The court ordered the Meyerses to comply with the CRC's May 28, 2009, and April 27, 2010, decisions.

The trial court later denied the Meyerses' motion for reconsideration requesting dismissal of the Saunderses' claims for failure to join the Somerset Homeowners Association and the CRC as necessary parties under CR 17 and CR 19. The Meyerses appealed.

## DISCUSSION

The crux of the Meyerses' appeal is whether their maple tree is subject to size restrictions and what CCR ¶ 10 means by "unnecessary interference." But, the Meyerses also dispute the CRC's authority to make a view obstruction determination. And, they argue that the Saunderses failed to join the CRC as a necessary party. They contend that an enforcement action to trim or remove the tree is barred by equitable doctrines such as estoppel and laches. And, lastly, the Meyerses ask us to vacate the trial court's award of attorney fees and costs, because there is no basis in the covenants for such an award.

---

[3] We refer to them collectively as the Saunderses.

5

## I. The CRC's Authority to Determine View Interference

CCR ¶ 10 provides that the "Building Committee shall be the sole judge in deciding whether there has been such an interference." By proper amendment of the covenants, the CRC replaced the Building Committee and was given "the same rights, powers and authorities as the Building Committee." Under these plain terms, the CRC is empowered to determine whether trees unnecessarily interfere with views.

The Meyerses argue that the CRC possessed no authority to revoke or repudiate the Building Committee's prior approval of their building plans. They explain that when the Building Committee approved their building plans in 1970, it did not require them to remove or alter their maple tree. Therefore, they argue, this constitutes a final, binding decision on the maple tree that cannot be attacked. Similarly, the Meyerses argue, without much analysis, that the Saunderses are barred from relief under RCW 4.16.040 and 4.16.080, as well as the doctrines of collateral estoppel, equitable estoppel, estoppel by silence or acquiescence, unjust enrichment, and laches. They explain that the Saunderses did not instigate the action until 40 years after the Building Committee approved their building plans.

We find no support in the covenants for the Meyerses' argument that the Building Committee's approval of building plans forecloses future attempts to enforce the tree height covenant.[4] First, there is no evidence that the Building Committee considered

___

[4] See Christensen v. Grant County Hosp. Dist. No. 1, 152 Wn.2d 299, 307, 96 P.3d 957 (2004) (requiring party asserting collateral estoppel to prove four elements, including that the identical issue was already presented in an earlier proceeding and ended with a judgment on the merits); see also Carrillo v. City of Ocean Shores, 122 Wn. App. 592, 610-11, 94 P.3d 961 (2004) (requiring the elements of equitable estoppel to be proven by clear, cogent, and convincing evidence).

the tree in approving the Meyerses' building plans. Second, retaining the existing tree did not require approval because it had been grandfathered. Third, most of the surrounding property was as yet undeveloped, without resident neighbors to complain about a view obstruction. Moreover, unlike buildings, trees grow and change with time. The record before us shows that the tree's width has doubled since 1970 when the Meyerses built their home. This makes application of collateral estoppel and laches particularly inequitable.

In addition, the Meyerses knew the restrictive covenants protected views of other property owners when they purchased their lot, even if they did not believe that grandfathered trees were subject to size restrictions.[5] Bauman v. Turpen, 139 Wn. App. 78, 93-94, 160 P.3d 1050 (2007) (holding that laches, equitable estoppel, and acquiescence did not apply where homeowners knew of a view deed restriction and that views were important to their neighbors). Therefore, we hold that the Saunderses' enforcement action is not barred by the theories advanced by the Meyerses.

## II. Homeowner's Authority to Bring an Enforcement Action

CCR ¶ 10 provides, in part: "In case of violation, the Building Committee shall have enforcement powers as set forth in Paragraph 1 of GENERAL PROVISION." The Meyerses argue that this provision means that Evergreen, the Building Committee, and the successor CRC are the only parties entitled to bring a view obstruction enforcement action. Therefore, they contend, absent the CRC's joinder under RCW 7.24.110, CR

---

[5] Simply because the Meyerses believed that the unnecessary interference restriction did not apply to their tree does not make it so. See, e.g., Bloome v. Haverly, 154 Wn. App. 129, 138-39, 225 P.3d 330 (2010) (holding that a homeowner's personal belief as to the scope and meaning of a view covenant was inadmissible extrinsic evidence).

17, and CR 19, the trial lacked subject matter jurisdiction and the case must be dismissed.

We find the Meyerses' argument unpersuasive for two reasons. First, they misconstrue subject matter jurisdiction. Washington superior courts have broad subject matter jurisdiction. CONST. art. IV, § 6. The critical concept in determining whether a court has subject matter jurisdiction is the type of controversy. Cole v. Harveyland, LLC, 163 Wn. App. 199, 209, 258 P.3d 70 (2011). Therefore, a court's jurisdiction does not turn on the presence or absence of a party. Wimberly v. Caravello, 136 Wn. App. 327, 334, 149 P.3d 402 (2006). Instead, failure to join affects only the court's authority over the absent party. Id. We review a court's decision that a party is not indispensible for abuse of discretion. Id.

Second, the Meyerses ignore CCR ¶ 1, which states:

> If the parties hereto or any of them or their heirs or assigns shall violate or attempt to violate any of the covenants herein, it shall be lawful for any person or persons owning any real property situated in Somerset, Division No. 3, Somerset, Division No. 4, and Somerset, Division No. 6 to prosecute any proceedings at law or in equity against the person or persons violating or attempting to violate any such covenant and either prevent him or them from so doing or to recover damages or other dues for such violation.

CCR ¶ 1 explicitly gives Somerset homeowners a legal right to enforce all of the covenants against other homeowners. The Meyerses are correct that CCR ¶ 10 gives the CRC power to enforce that particular covenant, but CCR ¶ 1 entitles homeowners to do the same. Therefore, the Saunderses are entitled to bring a legal action directly against the Meyerses for violating the covenants.

8

This is well supported in the case law. In Wimberly, one homeowner sought to enforce a restrictive covenant against another homeowner. 136 Wn. App. at 332. Like here, the neighborhood association had authority to enforce the covenants. Id. at 331. But, the terms of the covenant also allowed anyone owning land in the subdivision to bring a civil action to enforce the covenants. Id. The court held that the association was neither a necessary nor an indispensible party in the covenant enforcement action. Id. at 334-35. The association would not be prejudiced by the litigation and the homeowners did not assert or defend a claim against the association. Id. at 335.

Like in Wimberly, the Saunderses did not assert any claim against the CRC. Rather, they sued to enforce the covenant, which they were entitled to do under the plain terms of CCR ¶ 1. We hold that the trial court acted within its discretion in determining that the CRC was not an indispensible party in an action by homeowners to enforce CCR ¶ 10.

III.    Interpretation of the Covenant's Restriction on Trees

The Meyerses argue that CCR ¶ 10 created an express exception for all existing trees, including their maple tree. Therefore, they contend, their maple tree is not subject to any size restrictions—either height or width. As a result, the Meyerses argue, the trial court's order enforcing the CRC's decisions is erroneous. They also assert that the CRC and trial court impermissibly relied on extrinsic evidence to restrict the size of grandfathered trees.

Our primary task in interpreting a restrictive covenant is to determine the covenant drafter's intent by examining the clear and unambiguous language of the covenant. Bauman, 139 Wn. App. at 88-89. While the interpretation of a restrictive

9

covenant is a question of law, intent is a question of fact. Id. at 89. We review questions of law de novo and questions of fact for substantial evidence. Id. at 87. We must place special emphasis on arriving at an interpretation that protects the homeowners' collective interests. Riss v. Angel, 131 Wn.2d 612, 623-24, 934 P.2d 669 (1997). In Washington, the purpose of the covenant is the paramount consideration, rather than the free use of land. Id. at 623.

Washington courts apply the Berg context rule to interpret restrictive covenants. Hollis v. Garwall, Inc., 137 Wn.2d 683, 696, 974 P.2d 836 (1999) (citing Berg v. Hudesman, 115 Wn.2d 657, 801 P.2d 222 (1990)). Extrinsic evidence is admissible to determine the meaning of specific words and terms used in the covenant. Ross v. Bennett, 148 Wn. App. 40, 46, 203 P.3d 383 (2008). But, admissible extrinsic evidence does not include (1) evidence of a party's unilateral or subjective intent as to the meaning of a contract word or term; (2) evidence that would show an intention independent of the instrument; or (3) evidence that would vary, contradict, or modify the written word. Id.

CCR ¶ 10, which imposes restrictions on trees and is central to this dispute, reads in pertinent part:

> No trees of any type, other than those existing at the time these restrictive covenants . . . are filed, shall be allowed to grow more than twenty (20) feet in height, provided they do not unnecessarily interfere with the view of another residence.

This language is far from a model of clarity. However, some things are clear. The covenant neither prohibits trees altogether, nor prohibits view obstructions altogether. The owners' rights to trees and views are balanced against each other. Some trees are

subject to an absolute 20 foot height limit, and some are not. A view interference proviso applies to some, if not all, of the trees. What must be determined is whether the maple tree is grandfathered from the height restriction, whether it is grandfathered from the view restriction proviso, and if not, what it means to unnecessarily interfere with the view of another residence.

For ease of reference, a tree existing at the time the restrictive covenants were filed will be referred to as an existing tree. A tree planted after the restrictive covenants were filed will be referred to as a new tree.

A. Existing Trees Are Exempt from the 20 Foot Height Restriction

Undisputedly, the maple tree at issue existed at the time the restrictive covenants were filed. However, the Saunderses asserted below that the developer intended the grandfather exception to apply to only madrona and evergreen trees. They relied on the declaration testimony of Gerald Harkleroad, the developer's project manager, to establish the intent of the covenant.[6] While evidence is admissible to show the drafter's intent, it is not admissible to change the terms of the covenant. Ross, 148 Wn. App. at 46; see also Hollis, 137 Wn.2d at 697 ("Extrinsic evidence is to be used to illuminate what was written, not what was intended to be written."). CCR ¶ 10 grandfathers "those

---

[6] In a December 1989 declaration, Harkleroad explained:

> 7. Though the covenant language restricting tree height may seem to except from its coverage "trees in existence" at the time the covenants were recorded, the understanding of those involved at the time, including myself, was that this language was intended to cover the full grown Madrona and other evergreen trees in the subdivision.

His own intent is not at issue; he did not draft the covenant. His testimony about what others involved understood is not admissible. His understanding of the covenant at the time and how he applied the covenants is proper extrinsic evidence.

[trees] existing at the time" the covenants were filed, not just evergreens and madronas. The term "trees" is not ambiguous. It is in no need of interpretation. The plain meaning is not limited to evergreen and madrona trees. The covenant cannot be rewritten to exclude maple trees in the guise of determining intent.

We conclude that the Meyerses' maple tree was an existing tree and exempt from the 20 foot height limit imposed on new trees.

### B. Existing Trees Are Subject to View Restriction Proviso

The next question is whether the view interference proviso applies to existing trees. The proviso begins with the term "provided," which is defined as "on condition that" or "with the understanding" that. WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1827 (2002); BLACK'S LAW DICTIONARY 1345 (9th ed. 2009). The condition imposed is that "they do not unnecessarily interfere with the view of another residence." The parties disagree as to whether the word "they" refers to all trees or merely new trees.[7]

The Meyerses would have us read the provision as: "No new tree shall be allowed to grow more than 20 feet in height, nor may a new tree unnecessarily interfere with the view of another residence. Existing trees are not subject to these restrictions." This interpretation suggests that the drafter's were not concerned with view obstruction from existing trees, even those 60 feet tall and growing taller and wider. This interpretation also suggests that the drafters were instead concerned only that new trees might block views unnecessarily, even though they would approximate the height of homes in the single family development.

---

[7] Neither party argues that the proviso does not apply to new trees. The CRC interpreted the clause as applying to both new and existing trees.

Conversely, the Saunderses would have us read the provision as: "New trees shall not be allowed to grow more than 20 feet in height, and no tree may unnecessarily interfere with the view of another residence." This interpretation of the covenant suggests the drafters intended to protect all views from unnecessary interference by any tree, with the determination on a tree-by-tree basis.

Neither suggested interpretation is per se unreasonable. Where a provision is subject to more than one interpretation it is ambiguous. In re Det. of Aston, 161 Wn. App. 824, 842, 251 P.3d 917 (2011), review denied, 173 Wn.2d 1031, 277 P.3d 68 (2012). We find this covenant provision to be ambiguous. Therefore, we look to the intent of the drafters to determine its meaning. Ross, 148 Wn. App. at 46. The intent of the proviso is to protect views. In fact, there is no apparent reason to impose restrictions on trees except to protect views. With this as the primary concern, it is unlikely that the drafters would have been overly concerned with new, height-limited trees obstructing views, but have no concern whatsoever that existing trees, some already 60 feet high, would become even larger view obstructions.

The term "they" in the proviso at the end of the sentence reasonably may be read to refer back to "[n]o tree" at the beginning of the sentence. The term "no tree" encompasses every tree in the development; existing trees noted in the exception are merely a subset. Or, the term "they" could be read to apply to both new trees subject to the 20 foot height limit and those existing trees exempt from it. If the proviso was intended to apply only to new trees, the restrictions easily could have been drafted without reference to or exemption for existing trees: No tree planted after the filing of these covenants may exceed 20 feet in height or unnecessarily interfere with the view of

another homeowner. The structure of the proviso suggests it was intended to apply to existing trees as well as new trees.

And, the importance of protecting the views of Somerset residents is apparent from this and other covenants. For instance, CCR ¶ 3 prohibits above-ground current or telephone wires, as well as aerial antennas extending more than six feet above the highest point on a building. CCR ¶ 4 requires that the Building Committee consider "the effect or impairment that [improvements, construction and alterations] will have on the view of surrounding building sites" before approving them. CCR ¶ 4 also grants the CRC authority to establish the maximum height of each residence before construction. Similarly, Harkleroad explained that the purpose of restricting tree height was to protect the views of Somerset residents. He clarified that "[p]eople moved to and live in Somerset for the views not the trees. . . . The main focus for Evergreen as it developed Somerset was to preserve views."

Preserving neighboring views is a recognized interest and is not per se unreasonable. Bauman, 139 Wn. App. at 91. Covenants preserving views will be upheld when substantial evidence supports them. Id. Substantial evidence supports the conclusion that Somerset's scenic views are an intrinsic part of the aesthetic and monetary value of the lots. See Black v. Evergreen Land Developers, Inc., 75 Wn.2d 241, 247, 450 P.2d 470 (1969) (recognizing Somerset's "'sweeping panoramic view of Lake Washington, the Olympic Mountains, Seattle and Mercer Island'") (quoting trial court finding of fact 15)).

We conclude that the drafters intended the proviso to apply to all trees within the development regardless of when they were planted. Therefore, both new and existing

14

trees are subject to size restriction if they unnecessarily interfere with another homeowner's views.

C. Unnecessary Interference with View

Our final determination is what constitutes an unnecessary interference with a view from another residence. A person whose view is obstructed will feel the interference is unnecessary. A person who owns a tree will feel the interference is necessary. The CRC, which is the sole judge of when interference with the view is unnecessary, may have its own feelings. But, the proviso does not use a subjective "unreasonable interference" standard. Rather, it requires that the interference be unnecessary. What is a necessary interference depends on a balancing of rights, not feelings or preferences. Property owners have the right to own trees. The covenant conditioned this right, but did not take it away. Property owners also have a right to views. But, it is not an absolute right. The covenants did not prohibit every interference with views, only the unnecessary interference. And, the covenants did not expressly fix the size of trees or the maximum view obstruction as they existed when the covenants were filed. Nor do we believe such a provision is fairly implied.[8]

---

[8] Despite this, the CRC appears to have determined that view rights vested based on the dimensions of trees that existed when the covenants were filed. Under that theory, view rights would absolutely trump any growth of existing trees and planting of any new trees. The term "unnecessarily" would be effectively read out of the covenant with respect to new trees, because every interference with a view by a new tree would be subject to abatement. Cox v. Helenius, 103 Wn.2d 383, 387, 693 P.2d 683 (1985) (requiring every word of a provision to be given effect if possible). And, for existing trees, the term "unnecessarily" would be effectively defined as "interfering with a view more than at the time the covenant was filed." The proviso would be given different meanings for new and existing trees, rather than uniform application.

The portions of the tree necessary to its survival are a necessary interference with the view of another residence. What is necessary for survival may change as the tree matures. To the extent the crown of a tree can be trimmed without threatening its survival, its interference with the view of another residence is unnecessary. But, the covenants do not expressly grant authority to order a tree trimmed in a manner that will threaten its survival, though it may be reasonably implied for new trees due to the absolute 20 foot height limit. Decisions regarding what is an unnecessary interference must be factually based, applying the correct standard. The burden is on the party seeking enforcement of the CRC decision to demonstrate that it does not exceed what is authorized by the covenant.

The correct standard was not applied by the CRC or by the trial court.[9] The CRC ordered the Meyerses to remove the maple tree if trimming it to 30 feet wide would adversely affect the tree's health. Therefore, we void the decision of the CRC and reverse the decision of the trial court enforcing that decision.

IV.    Attorney Fees and Costs

Lastly, the Meyerses contend that the trial court erred in awarding attorney fees and costs. They contend that even if the Saunderses properly prevailed, CCR ¶ 1 authorizes an award of only costs, not attorney fees, to homeowners seeking to enforce the covenants. The superior court awarded the Saunderses and O'Briens $65,149.47 in

---

[9] The Meyerses argue at length that the CRC's decision was nonbinding, unreasonable, and arbitrary. The Meyerses are correct that the CRC's decision must be reasonable under Riss, 131 Wn.2d at 627. Because the CRC's decisions were based on an incorrect interpretation of the covenant, they are unreasonable as a matter of law. But, we note that nothing in the covenants precludes the Somerset Homeowners Association or the CRC from creating view guidelines to aid their decisions nor from utilizing voluntary mediation or some other informal processes.

attorney fees and $7,118.04 in costs, pursuant to CCR ¶ 18, RCW 4.84.330, and chapter 64.38 RCW.

In Washington, absent a contract, statute, or recognized ground of equity, attorney fees will not be awarded as part of the costs of litigation. <u>City of Seattle v. McCready</u>, 131 Wn.2d 266, 275, 931 P.2d 156 (1997). Whether a particular contractual provision authorizes an award of attorney fees as costs is a legal question. <u>Tradewell Grp., Inc. v. Mavis</u>, 71 Wn. App. 120, 126, 857 P.2d 1053 (1993).

CCR ¶ 1 permits homeowners to sue other homeowners for violating the restrictive covenants. CCR ¶ 1 provides: "<u>All costs incurred</u> in enforcement shall be at the expense of the violator or violators." (Emphasis added.) Conversely, CCR ¶ 18 states:

> In the event of litigation arising out of enforcement of these restrictive covenant [s] . . . the grantee or grantees so involved, shall be liable for the payment of <u>all attorney fees court costs and/or other expense or loss incurred by Evergreen Land Developers, Inc.</u>, in enforcing these restrictive covenants.

(Emphasis added.) CCR ¶ 18 extends attorney fees to Evergreen's successors, as well.

The Somerset covenants clearly distinguish between attorney fees and costs. They award attorney fees only to Evergreen and its successors, while limiting homeowners to costs. This makes sense, because it protects the developer from costly litigation with nonconforming homeowners. Here, homeowners sought to enforce the covenants, not Evergreen or its successor. Because the covenant distinguishes between attorney fees and costs, there is no basis to award attorney fees as part of the costs of litigation.

17

And, the Saunderses cite no other persuasive basis for attorney fees. RCW 4.84.330 is not applicable, because it only applies to instruments entered into after September 21, 1977. The Somerset restrictive covenants took effect in 1962. Similarly, RCW 64.38.020(4) and RCW 64.38.050 authorize a homeowners association to initiate litigation and collect attorney fees as the prevailing party. But, the Somerset CRC was not a party here. Therefore, the prevailing party in this action is entitled to an award of only costs, not attorney fees, both at trial and on appeal.

Because we reverse the decision of the trial court, the Meyerses are the prevailing party. Because they requested costs at trial, they will be entitled to an award of costs on remand. They have not sought costs on appeal, so we award none.

We void the decision of the CRC, reverse the order of the trial court, and remand to the trial court with instructions to award costs to the Meyerses and to dismiss the action.

WE CONCUR:

18