# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| WILLIAM G. PARDEE and SHANNON D. PARDEE, husband and wife, | No. 53126-7-II |
| Appellants, | |
| v. | |
| EVERGREEN SHORES BEACH CLUB, a Washington nonprofit corporation; NICHOLAS PALMER and JANE DOE PALMER, husband and wife; JOHNNY KRAWCHOOK and JANE DOE KRAWCHOOK, husband and wife; KRIS KINNEAR and JOHN DOE KINNEAR, husband and wife; JON KNUTSON and JANE DOE KNUTSON, husband and wife; BRUCE BAMFORD and JANE DOE BAMFORD, husband and wife; SYLVIA DAVENPORT and JOHN DOE DAVENPORT, husband and wife; PAT ANDERSON and JANE DOE ANDERSON, husband and wife, | UNPUBLISHED OPINION |
| Respondents. | |
| and | |
| VANTAGE COMMUNITY MANAGEMENT, INC., a Washington profit corporation, | |
| Defendant below. | |

MELNICK, J. — William and Shannon Pardee,[1] homeowners and members of the Evergreen Shores Beach Club homeowners association (ESBC), brought action against the ESBC, individual ESBC board members, and other residents of the neighborhood for (1) discrimination under the Washington State Law Against Discrimination (WLAD), (2) defamation, defamation per se, and false light, (3) various violations of the ESBC's governing documents, and (4) civil conspiracy. The Superior Court granted the ESBC's motion for summary judgment and the Pardees appealed.

We affirm.

FACTS

The Pardees own property in the Evergreen Shores subdivision in Thurston County. At some point prior to the instant lawsuit, Shannon became an ESBC board member. Evergreen Shores residents are subject to a declaration of covenants, conditions, and restrictions (CCRs) that are enforced by the ESBC.

The ESBC is a nonprofit organization organized under the Washington Nonprofit Corporation Act, chapter 24.03 RCW, and is governed by a board of directors which is subject to the articles of incorporation and the bylaws. A board member can be removed by a two-thirds vote of the ESBC membership.

Evergreen Shores has four divisions, each of which have separate, but nearly identical CCRs. Division three includes a park that fronts Black Lake and contains a "clubhouse" and a "cookshed." Evergreen Shores lot owners each own a 1/482 interest in the park via quitclaim deed. Each lot gets one vote.

---

[1] Since the Pardees have the same last name, we occasionally use their first names to avoid confusion. We intend no disrespect.

2

The CCRs state in relevant part:

3. Temporary Structures: No structures of a temporary character, including but not limited to trailers, basement houses, tents, garages, barns or other outbuildings shall be used on any lot at any time as a residence either temporarily or permanently.
. . . .
8. Nuisances: No noxious or offensive activity shall be carried on upon any lot, nor shall anything be done thereon which may be or become an annoyance or nuisance to the neighborhood.
. . . .
16. Enforcement: Enforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenants either to restrain violation or to recover damages.
. . . .
18. Waiver or Change of Covenants: The restrictive covenants contained herein may be waived or changed by the majority of the then owners when land contours or other circumstances would cause an undue hardship. A majority of the then owners shall be the sole judge of the necessity for waiving or changing the restrictive covenants in cases of undue hardship.
19. Architectural Control: No building or structure shall be placed, erected, or altered on any lot until the construction plans and specifications and a plan showing the location of the structure have been submitted and approved in writing by the Architectural Planning Committee which shall be composed of three (3) members who will be the elected officers of the EVERGREEN SHORES BEACH CLUB, INC. . . .
20. Evergreen Shores Beach Club, Inc.: The developer, SUNDOWN, INC., has formed a separate non-profit corporation and has built and is paying for the clubhouse, swimming pool, and designated parking areas, and in addition will, in the future, include a grant to said non-profit corporation approximately seven hundred (700) front feet of Black Lake on an area that is within EVERGREEN SHORES, DIVISION THREE, but will be accessible to [all divisions], and will be jointly used by the owners of lots in all divisions of EVERGREEN SHORES. . . . The vote regarding operation of said beach club shall be on the basis of one (1) vote per lot ownership.

Clerk's Papers (CP) at 282-85.

The articles of incorporation state that one of the purposes of the ESBC is:

2. To enforce the conditions, restrictions, charges and restrictive covenants at any time created for the benefit of said property . . . and to pay the expenses incident to the enforcement of the same and the collection of said charges, and the enforcement of al1 the restrictive covenants applicable to the plat of EVERGREEN SHORES (all Divisions) of which the park and recreation area shall be an integral part.

CP at 254.

In February 2017, the ESBC Board approved an enforcement policy that included a fine and fee schedule. It allowed the Board to fine residents for violations of the governing documents, including the CCRs. The Board determined that "[c]orrecting compliance issues at the lowest possible level is in the best interests of the [ESBC] because it reduces the amount of administrative time necessary to deal with infractions, lessens the duration of infractions, and may save in legal expense. It also promotes a harmonious living environment. To this end, a fine schedule for violations of the Governing Documents helps the [ESBC] ensure residents' compliance with the Governing Documents." CP at 288.

At various times throughout 2017-18, the ESBC Board engaged with residents of Evergreen Shores at the board meetings and through the ESBC newsletter to gather information to revise the CCRs.

I.      EVENTS PRIOR TO LAWSUIT

        A.      The Commonly Owned Park

The ESBC allows members to rent out the clubhouse and cookshed. The ESBC has an unwritten policy of not allowing private parties to rent the entire park for events "because it provides [no] benefit to the neighborhood as a whole," and because those events exclude members from the park. CP at 393.

The exception to this policy involves the Black Lake Regatta. The ESBC rents the park to a third party that hosts a regatta for three days during the summer. The ESBC has rented the park out for the regatta since at least 2015. The regatta participants and guests park mobile homes and set up tents in the park to stay overnight. Food vendors and bleachers are set up. One set of

bleachers is reserved exclusively for Evergreen Shores members, who get free admission to the event.

In March 2017, Shannon e-mailed the ESBC rental coordinator requesting to rent the clubhouse one day a week. The coordinator explained that they would need to know specific dates because each rental would require a new rental agreement, and that "the rentals are a manual process between several people and reserved dates don't always get reflected on the calendar." CP at 403. Shannon eventually rented the clubhouse every week for a number of months.

B.      Removal from Facebook Page

In October 2016, Shannon posted to the ESBC Facebook page about Washington statutes and case law regarding dangerous dogs. The post began, "RCW 16.08.020 gives citizens the right to kill dogs under certain circumstances, and places upon owners of such dogs who are notified of their propensities duties to do certain things." CP at 358. The post also included a summary of a decision where the court found that a landowner was justified for shooting dogs on his property.

Sometime in late 2016, after the above-referenced post, Shannon was removed from the ESBC Facebook page and she could no longer post on or access the page. Minutes from a January 2017 board meeting reported that Shannon was removed in part for inappropriate posting about hazardous dogs.

C.      Records Request

In late 2017, the Pardees e-mailed Vantage, the ESBC's community management company, to request access to all documentation of the ESBC. The Vantage representative explained that Vantage did not have access to the records kept in the ESBC clubhouse, and a record storage company had the other records. The costs of viewing the records, which included staff time, copies at a per-page cost, and delivery from the storage facility, would be assessed to the

ESBC because Shannon was a board member at the time. Shannon made an appointment to inspect the records but the day prior to the scheduled appointment, Vantage contacted Shannon and informed her that due to short staffing, it would be unable to keep the appointment. Vantage also informed Shannon that the ESBC Board had advised Vantage that her request was not a Board project, and therefore she would need to pay the cost of pulling the files.[2]

The Pardees contended that the ESBC Board never responded to their request to look at records. However, in a deposition, William acknowledged that a long e-mail string existed on this issue. The e-mails were between the ESBC Board and his wife.

## II.    THE LAWSUIT

The Pardees initially filed a complaint against Vantage, the ESBC, past and present members of the ESBC Board, and other Evergreen Shores residents. The Pardees alleged that the ESBC discriminated against Shannon because of her creed, sex, and disability in violation of Washington's Laws Against Discrimination (WLAD), RCW 49.60.030(l)(b), by "making the Clubhouse . . . available for rental only with considerable arbitrary scrutiny, not allowing [Shannon] or other members to rent the Park in its entirety, . . . and in removing her from the ESBC Facebook account." CP at 36. The Pardees also allege that ESBC violated RCW 64.38.045 and breached the duty of care by denying them access to the ESBC records.

The Pardees also requested injunctive and declaratory relief regarding the ESBC's power to engage in various actions. First, the Pardees claimed that the ESBC did not have the power to adopt or use the enforcement policy adopted in February 2017. Second, the Pardees asserted that the ESBC Board illegally attempted to amend the CCRs by gathering information and preparing to amend the CCRs without first making a finding that amendments were necessary because of

---

[2] The record on appeal does not contain copies of any of the e-mails regarding the records request.

undue hardship.  Third, the Pardees claimed that the CCRs prohibited the ESBC from renting the park to a third party for the Black Lake Regatta.  Alternatively, they claimed that the rental violated their right to use and possess the whole of the park as tenants in common.  Fourth, the Pardees claimed that the ESBC Board failed to appoint or convene an architectural planning committee as required by the CCRs.  The Pardees also claimed that the actions that were contrary to the CCRs constituted negligent acts and a breach of the Board's duty of care.

III.    EVENTS FOLLOWING FILING OF LAWSUIT

After the Pardees filed their lawsuit, Ashley Lieb, Zene Snider, Aaron MacLean, and Dan Solie[3] made various comments about Shannon on the ESBC Facebook page.  Ashley Lieb encouraged neighbors to attend the next board meeting to vote Shannon off the board.

The post stated that Shannon was a bully; she filed the instant lawsuit because she was voted out as ESBC Board Vice President; she was blocked from the ESBC Facebook site "due to harassment and [making] threats to shoot at people and their dogs if they come near her property"; "she has made false claims towards her neighbors"; she verbally, face-to-face, "attacked" Ashley Lieb's boyfriend; "she screamed at the bus driver for being three minutes late[]"; she was "unstable"; she was voted on to the ESBC Board because of the other members' fear of retaliation if they did not vote for her; "because of her, [the ESBC] will not be able to have anything else fun" at the clubhouse; the ESBC pool may not open because no one wants to deal with her; she is crazy; she is "insane"; the ESBC Board has not been able to complete anything since she became a member due to her always disagreeing with anything good for the community.  CP at 456, 458.

---

[3] Ashley Lieb resided in Evergreen Shores but was not an ESBC member.  Zene Snider and Aaron MacLean were ESBC members and they became ESBC board members after the comments at issue were made.  Dan Solie was a former ESBC board member and former ESBC member.

Defendant Zene Snider commented on the page several times, stating that "[Shannon] wants to ban the Regatta because she was denied her requested use [of the ESBC clubhouse] free of charge, for monthly homeschool meetings," CP at 459; the instant lawsuit she and her husband filed was frivolous; that she is suing all but two board members; and "if one family with dilutions [sic] is throwing their weight around, scares away anyone that would volunteer, it will be a sad day," CP at 465; and she was "a problem board member." CP at 466.

On another neighborhood social media website, defendant Dan Solie posted "[Shannon] was a plague to the [Board] when I served, it looks like she's still a plague now." CP at 475.

On May 15, a resident of Evergreen Shores called the police to report an incident involving Shannon. The complaining party told the officer that her teenage son and his friend walked by the Pardees' residence and heard Shannon yell "'Keep looking! Come down here so I can shoot you!' or something similar." CP at 355. The complaining party requested that she remain anonymous but did tell the officer that she "was an HOA board member that is being sued by the other involved party, who is also an HOA board member." CP at 355. The police report names Doug Hagen as the caller.

On May 2, Shannon received notice that the ESBC Board planned to call a vote in 19 days to remove her from the Board because of, "general lack of candor, difficulty working with others, unprofessional communications, and interference with Board and [ESBC] projects and [ESBC] contractors." CP at 443. At the meeting, the ESBC members voted to remove Shannon from the Board.

The Pardees filed a second amended complaint, alleging that the ESBC Board's removal of Shannon was in retaliation for filing the instant suit, in violation of chapter 49.60 RCW's anti-

retaliation clause. The Pardees also added claims for defamation, defamation per se, and false light, based on the social media posts and the police report.

All defendants moved for summary judgment and the court granted the motion. The Pardees appeal as to all defendants, except Vantage.

ANALYSIS

The Pardees argue that the court erred in granting summary judgment to the ESBC because they presented sufficient evidence to prove that the ESBC discriminated against Shannon in its rental process, by removing her from the Facebook site and by removing her from the ESBC Board of Directors in retaliation for filing the lawsuit. We disagree.

I.     DISCRIMINATION UNDER WLAD

WLAD recognizes the right to be free from discrimination because of race, creed, color, national origin, sex, or the presence of any sensory, mental, or physical disability. RCW 49.60.030. The right to be free from discrimination includes the right to "the full enjoyment of any of the accommodations, advantages, facilities, or privileges of any place of public resort, accommodation, assemblage, or amusement." RCW 49.60.030(1)(b).

To make out a prima facie case under the WLAD for discrimination in the public accommodations context, the plaintiff must establish four elements, that the (1) plaintiff is a member of a protected class, RCW 49.60.030(1); (2) defendant is or owns a place of public accommodation, RCW 49.60.215; (3) defendant discriminated against the plaintiff, whether directly or indirectly; and (4) discrimination occurred "because of" the plaintiff's status or, in other words, that the protected status was a substantial factor causing the discrimination. RCW 49.60.030; *State v. Arlene's Flowers, Inc.*, 187 Wn.2d 804, 821-22, 389 P.3d 543 (2017), *judgment*

9

*vacated and remanded*, 138 S. Ct. 2671 (2018), *aff'd on remand*, 193 Wn.2d 469, 441 P.3d 1203 (2019).

Washington courts have long equated the term "creed" in the WLAD with the term "religion." *Kumar v. Gate Gourmet Inc*., 180 Wn.2d 481, 489, 325 P.3d 193 (2014); see also *Riste v. E. Wash. Bible Camp, Inc*., 25 Wn. App. 299, 302, 605 P.2d 1294 (1980) ("Creed, as used in [WLAD] and in its common dictionary meaning, refers to a system of religious beliefs.").

A.    ESBC Rental Process and Facebook Page

The Pardees argue that "creed" under the WLAD can be interpreted as any "set of principles and opinions . . . expressed and adhered to," and that the ESBC discriminated against Shannon because of those principles and opinions. Appellant's Br. at 14.

The Pardees' claim fails because they have not proven or even alleged that Shannon is a member of a protected class. Existing case law supports the conclusion that the definition of "creed" extends only to religion and religious beliefs. The Pardees do not cite to legal authority to support the claim that that creed extends to any beliefs on any subject. The Pardees also fail to present any evidence or argue the existence of any specific principles or opinions Shannon holds that caused the ESBC to discriminate against her. The Pardees argument on this issue fails.

B.    Removal from the Board

The Pardees claim that Shannon's removal from the Board was due, at least in part, in retaliation for filing the instant lawsuit in violation of RCW 49.60.210(1).

"It is an unfair practice for any employer, employment agency, labor union, or other person to discharge, expel, or otherwise discriminate against any person because he or she has opposed any practices forbidden by this chapter, or because he or she has filed a charge, testified, or assisted in any proceeding under this chapter." RCW 49.60.210(1).

To maintain a retaliation claim under the WLAD, a plaintiff must establish that "(1) she participated in a statutorily protected activity; (2) an adverse employment action was taken against her; and (3) her activity and the employer's adverse action were causally connected. *Hollenback v. Shriners Hosps. For Children*, 149 Wn. App. 810, 821, 206 P.3d 337 (2009).

The Pardees cannot satisfy the elements of a retaliation claim. The relationship between Shannon and the ESBC is neither an employee-employer relationship nor its functional equivalent.[4] The court did not err in dismissing this claim.

II. DEFAMATION

The Pardees argue that the court erred in granting summary judgment to ESBC as to the claims for defamation, defamation per se, and false light. We disagree.

A. Defamation and Defamation Per Se

"When a defendant in a defamation action moves for summary judgment, the plaintiff has the burden of establishing a prima facie case on all four elements of defamation: falsity, an unprivileged communication, fault, and damages." *LaMon v. Butler*, 112 Wn.2d 193, 197, 770 P.2d 1027 (1989). "The prima facie case must consist of specific, material facts, rather than conclusory statements, that would allow a jury to find that each element of defamation exists." *LaMon*, 112 Wn.2d at 197. "A mere conclusory statement not supported by facts admissible in evidence cannot be considered on a motion for summary judgment." *Mark v. Seattle Times*, 96 Wn.2d 473, 490, 635 P.2d 1081 (1981); CR 56(e).

"If the plaintiff is a public figure or public official, he must show actual malice. If, on the other hand, the plaintiff is a private figure, he need show only negligence." *LaMon*, 112 Wn.2d at

---

[4] This claim is not supported by *Galbraith v. TAPCO Credit Union*, 88 Wn. App. 939, 946 P.2d 1242 (1997). *See Malo v. Alaska Trawl Fisheries*, *Inc.*, 92 Wn. App. 927, 965 P.2d 1124 (1998).

197. "The negligence standard is that the defendant knew or, in the exercise of reasonable care, should have known that the statement was false or would create a false impression in some material respect." *Vern Sims Ford, Inc. v. Hagel*, 42 Wn. App. 675, 680, 713 P.2d 736 (1986).

"A publication is defamatory per se (actionable without proof of special damages) if it '(1) exposes a living person to hatred, contempt, ridicule or obloquy, to deprive him of the benefit of public confidence or social intercourse, or (2) injures him in his business, trade, profession or office.'" *Life Designs Ranch, Inc. v. Sommer*, 191 Wn. App. 320, 328, 364 P.3d 129 (2015) (quoting *Caruso v. Local Union No. 690 of Int'l Bhd. of Teamsters*, 100 Wn.2d 343, 353, 670 P.2d 240 (1983)).

To establish the falsity element of defamation, the plaintiff must show the offensive statement was "provably false." *Schmalenberg v. Tacoma News, Inc.*, 87 Wn. App. 579, 590, 943 P.2d 350 (1997). Washington does not require a defamation defendant to "prove the literal truth of every claimed defamatory statement." *Mark*, 96 Wn.2d at 494. "A defendant need only show that the statement is substantially true or that the gist of the story, the portion that carries the 'sting', is true." *Mark*, 96 Wn.2d at 494.

"To determine whether a statement is nonactionable [opinion], a court should consider at least (1) the medium and context in which the statement was published, (2) the audience to whom it was published, and (3) whether the statement implies undisclosed facts." *Dunlap v. Wayne*, 105 Wn.2d 529, 539, 716 P.2d 842 (1986).

"[T]he nature of the medium can affect whether a statement is received as 'fact' or 'opinion': statements of opinion are expected to be found more often in certain contexts, such as editorial pages or political debates." *Wayne*, 105 Wn.2d at 539. In regard to the nature of the audience, the court "should thus consider whether the audience expected the speaker to use

exaggeration, rhetoric, or hyperbole." *Wayne*, 105 Wn.2d at 539. "'In the context of ongoing public debates, the audience is prepared for mischaracterizations and exaggerations, and is likely to view such representations with an awareness of the subjective biases of the speaker.'" *Wayne*, 105 Wn.2d at 539 (quoting *Note, Fact and Opinion After Gertz v. Robert Welch, Inc.: The Evolution of a Privilege*, 34 RUTGERS L. REV. 81 (1981)).

We have reviewed the statements the Pardees allege form the bases of their defamation and defamation per se claims. They can be categorized as opinions, substantially true, or not shown to be provably false. In addition, we are cognizant that the statements were posted on a social media page where the audience expects the speaker to use exaggeration, rhetoric, or hyperbole. *Wayne*, 105 Wn.2d at 539. The Pardees have submitted no evidence of either the falsehood of these statements or that the speakers were negligent in making them, they have not met the burden of establishing a prima facie case of defamation or defamation per se.

As to the Pardees' allegation that the police report is false and forms the basis for a claim, they have failed to show it was negligently made. In addition, as to who made the statement in the police report, they have not supported their assertion with any admissible evidence.

The Pardees have failed to make a prima facie case for defamation or defamation per se. The court did not err in dismissing these claims.

B.      False Light

"'A false light claim arises when someone publicizes a matter that places another in a false light if (a) the false light would be highly offensive to a reasonable person and (b) the actor knew of or recklessly disregarded the falsity of the publication and the false light in which the other would be placed.'" *Life Designs Ranch, Inc. v. Sommer*, 191 Wn. App. 320, 339, 364 P.3d 129 (2015) (quoting *Eastwood v. Cascade Broad. Co.*, 106 Wn.2d 466, 470-71, 722 P.2d 1295 (1986)).

13

A plaintiff does not need to be defamed in order to bring a false light claim. *Eastwood*, 106 Wn.2d at 471. However, the plaintiff must allege falsity. *Emeson v. Dep't of Corr.*, 194 Wn. App. 617, 640, 376 P.3d 430 (2016).

Here, for the same reasons the Pardees did not show falsity for their defamation claims, they also fail to show falsity for a false light claim. Additionally, the Pardees did not present any evidence to show that defendants made the statements knowing or recklessly disregarding the falsity. They are unable to establish a prima facie case of false light.

The trial court did not err by granting summary judgement on the false light claim.

III.     ACCESS TO THE ESBC RECORDS

The Pardees argue that the court erred in granting summary judgment to ESBC from being denied access to the ESBC records. They argue that they are still entitled to damages caused by the past bad behavior, even if they are no longer seeking access to the records.

The ESBC argues that the claim is moot because the Pardees are no longer seeking access to the records, and even if the claim is not moot, Vantage did not deny the Pardees access to the records because Vantage is permitted to charge a reasonable fee, and the ESBC Board never denied a request. We agree with the ESBC.

RCW 64.38.045(2) states:

> All records of the association, including the names and addresses of owners and other occupants of the lots, shall be available for examination by all owners, holders of mortgages on the lots, and their respective authorized agents on reasonable advance notice during normal working hours at the offices of the association or its managing agent. The association may impose and collect a reasonable charge for copies and any reasonable costs incurred by the association in providing access to records.

"'A case is moot if a court can no longer provide effective relief' and the issues it presents are 'purely academic.'" *Kuehn v. Renton Sch. Dist. No. 403*, 103 Wn.2d 594, 597, 694 P.2d 1078

14

(1985) (quoting *In re Det. of Cross*, 99 Wn.2d 373, 376-77, 662 P.2d 828 (1983); *State v. Turner*, 98 Wn.2d 731, 733, 658 P.2d 658 (1983)).

An appellant has the burden of producing a record from which a court can decide the issues on appeal. *Brothers v. Pub. Sch. Emps. of Wash.*, 88 Wn. App. 398, 409, 945 P.2d 208 (1997). When the appellant fails to provide an adequate record for review, we must affirm the trial court's ruling. *Story v. Shelter Bay Co.*, 52 Wn. App. 334, 346, 760 P.2d 368 (1988).

Although the Pardees are no longer seeking declaratory or injunctive relief, the complaint also requested damages to be proven at trial due to defendants' failure to allow access to the ESBC documents. The claim therefore is not moot. Nevertheless, the court did not err in granting summary judgment.

The Pardees have requested two sets of records. The first are controlled by Vantage, the community management company. The second are controlled by the ESBC Board and they are stored at the ESBC clubhouse.

The Pardees claim that the fee to inspect the records housed with Vantage was unreasonable. However, the fee is not imposed by the ESBC. This set of records is stored with a third-party company that charges Vantage a per-box fee to deliver. The Pardees did not appeal the claims against Vantage after the court granted summary judgment. Therefore, we do not address whether the fee was reasonable.

Additionally, the ESBC did not deny the Pardees access to the files housed with Vantage. Vantage canceled the meeting and the Pardees chose not to reschedule. Vantage is no longer a party in this case; therefore, we do not address the claims as to the records kept off-site by Vantage.

In regard to the records stored at the ESBC clubhouse, the Pardees claim that ESBC did not respond to Shannon's request to access these records, and the ESBC does not contradict this

assertion. However, in a deposition, William stated that a long e-mail string between Shannon and the Board existed regarding the records request. Because neither the original e-mail to the ESBC nor the e-mail string between Shannon and other board members is included in the record, we cannot determine what, if any, response the Pardees received from the ESBC Board to review the records contained in the clubhouse. It therefore cannot determine whether the Board constructively denied the Pardees' request. Because the Pardees fail to provide an adequate record for review, ESBC prevails on this issue. *Story*, 52 Wn. App. at 346.

IV.     VIOLATIONS OF GOVERNING DOCUMENTS

A.     Legal Principles

The interpretation of a restrictive covenant is a question of law that we review de novo. *Wimberly v. Caravello*, 136 Wn. App. 327, 336, 149 P.3d 402 (2006).

The primary task in "interpreting a restrictive covenant is to determine the covenant drafter's intent by examining the clear and unambiguous language of the covenant." *Saunders v. Meyers*, 175 Wn. App. 427, 438-39, 306 P.3d 978 (2013). "The court's goal is to ascertain and give effect to those purposes intended by the covenants." *Riss v. Angel*, 131 Wn.2d 612, 621, 934 P.2d 669 (1997). The court must place "special emphasis on arriving at an interpretation that protects the homeowners' collective interests." *The Lakes at Mercer Island Homeowners Ass'n v. Witrak*, 61 Wn. App. 177, 181, 810 P.2d 27 (1991).

"[I]f more than one reasonable interpretation of the covenants is possible regarding an issue, we must favor that interpretation which avoids frustrating the reasonable expectations of those affected by the covenants' provisions." *Green v. Normandy Park*, 137 Wn. App. 665, 683, 151 P.3d 1038 (2007).

16

B.      Amending the CCRs

The Pardees argue that the ESBC Board violated the CCRs by considering amendments without first making a determination that "land contours or other circumstances" leading to undue hardship warranted amending the CCRs. Appellant's Br. at 37.

The CCRs state "the restrictive covenants contained herein may be waived or changed by the majority of the then owners when land contours or other circumstances would cause an undue hardship. A majority of the then owners shall be the sole judge of the necessity for waiving or changing the restrictive covenants in cases of undue hardship." CP 267, 275, 279-280, 285.

The clear and unambiguous language of the provision does not indicate that the board must take any specific action prior to presenting proposed amendments to the membership. Should any owners determine that it is not necessary to make amendments, they may vote against the amendments as provided by the CCRs. We conclude that the court properly granted summary judgment on this claim.

C.      The Black Lake Regatta

The Pardees' first argue that their interest in the park creates a tenancy in common, and the rental of the park for the regatta violates their right as tenants in common to use, possess, and enjoy the park. The Pardees also argue that the ESBC violates the CCRs by contracting with a third party to rent the park for the Black Lake Regatta. They contend that the ESBC board members have acted negligently by ignoring the governing documents that prohibit the regatta.

"Every interest created in favor of two or more persons in their own right is an interest in common, . . . unless declared in its creation to be a joint tenancy, as provided in RCW 64.28.010." RCW 64.28.020(1). Each cotenant is entitled to the use, possession, and benefit of the whole of the property. Thus, one tenant in common may lawfully lease, sell, or otherwise dispose of its

interest in the common property, without the consent of the other cotenants. *De La Pole v. Lindley*, 131 Wash. 354, 358, 230 P. 144 (1924). The only limitation is that a cotenant may not interfere with the coequal rights of the other cotenants. *De La Pole*, 131 Wash. at 358.

The deed for a 1/482 interest in the park issued to each homeowner of Evergreen Shores created a tenancy in common. Therefore, each deed holder is entitled to the use, possession, and benefit of the whole property. However, the Pardees' right as a cotenant to the use, possess, or benefit from the property does not preclude any other cotenant from leasing their interest in the property. *De La Pole*, 131 Wash. at 358. The Pardees argue that the regatta excluded them from the park. This allegation is untrue. ESBC members are granted free access to the park during the event and the Pardees have presented no evidence that they have otherwise been excluded. The Pardees' right as cotenants in common have not been interfered with.

There is nothing in the CCRs that explicitly prohibits the rental of the park to a third party for an event. The CCRs only require that the operation of the community area will be on the basis of one vote per lot ownership. Nevertheless, the Pardees argue that the park is subject to the same covenants as the individual lots. We agree to the extent that the park is subject to the covenants, but the Pardees have not presented a genuine issue of material fact as to whether the regatta violates the CCRs. Therefore, we conclude that the court did not err in granting summary judgment on this claim.

D. Architectural Committee

The Pardees argue that the CCRs require the ESBC Board to convene an architectural control committee to evaluate requested changes by owners. We dismiss this claim because it is non-justiciable.

For declaratory judgment purposes, a justiciable controversy is:

> "(1) . . . an actual, present and existing dispute, or the mature seeds of one, as distinguished from a possible, dormant, hypothetical, speculative, or moot disagreement, (2) between parties having genuine and opposing interests, (3) which involves interests that must be direct and substantial, rather than potential, theoretical, abstract or academic, and (4) a judicial determination of which will be final and conclusive."

*Nollette v. Christianson*, 115 Wn.2d 594, 599, 800 P.2d 359 (1990) (quoting *Diversified Indus. Dev. Corp. v. Ripley*, 82 Wn.2d 811, 815, 514 P.2d 137 (1973)). Absent these elements, the court "steps into the prohibited area of advisory opinions." *Diversified Indus. Dev. Corp.*, 82 Wn.2d at 815.

The Pardees have neither argued nor presented evidence of any alterations made to lots either by them or other ESBC members that violate the covenants because of the lack of approval from an architectural control committee. They have failed to present an actual dispute that would render a decision by this court anything but an advisory opinion. Therefore, we conclude that the court did not err by granting summary judgment to ESBC on this claim.

E. Enforcement

The Pardees argue that the ESBC is prohibited from adopting or using the enforcement policy because the CCRs require enforcement through judicial proceeding only. They contend that the language used indicates that the developer of the ESBC neighborhood wanted to prevent ESBC Board actions against homeowners for alleged violations of the CCRs, without the due process protection of the courts. We disagree. The record does not show of any instance where the Board has used the enforcement policy, so we only address the Board's authority to adopt the policy.

19

The CCRs provide that "[e]nforcement shall be by proceedings at law or in equity against any person or persons violating or attempting to violate any covenants either to restrain violation or to recover damages." CP at 267, 275, 279, 284.

The articles of incorporation state that one of the purposes of forming the ESBC is "[t]o enforce the conditions, restrictions, charges and restrictive covenants at any time created for the benefit of said property and all other property in the plat of EVERGREEN SHORES and for the owners thereof." CP at 254.

Unless otherwise provided by governing documents, an association may "[a]dopt and amend bylaws, rules, and regulations" and "[i]mpose and collect charges for late payments of assessments and . . . levy reasonable fines in accordance with a previously established schedule adopted by the board of directors and furnished to the owners for violation of the bylaws, rules, and regulations of the association." RCW 64.38.020(1), (11). "Assessment" means all sums chargeable to an owner by an association in accordance with RCW 64.38.020. RCW 64.38.010(1).

"Shall" is interpreted as directory, rather than mandatory, when a literal reading would frustrate the legislative intent. *State ex rel. Royal v. Bd. of Yakima County Comm'rs*, 123 Wn.2d 451, 458, 869 P.2d 56 (1994).

The bylaws do not explicitly grant the Board with the power to adopt a fine and fee schedule, nor do they prohibit it. Applicable state law allows for the adoption of fee schedule. RCW 64.38.020. Most importantly, one of the primary purposes of establishing the ESBC is to enforce the CCRs.

An interpretation of "shall" as mandatory or, in this case, the exclusive method of enforcement would frustrate the intent of the covenants. *Bd. of Yakima County Comm'rs*, 123

Wn.2d at 458.[5]  In creating the policy, the Board determined that "[c]orrecting compliance issues at the lowest possible level is in the best interests of the [ESBC] because it reduces the amount of administrative time necessary to deal with infractions, lessens the duration of infractions, and may save in legal expense.  It also promotes a harmonious living environment."  CP at 288.  Interpreting 'shall' in a way that does not frustrate purpose of the covenants "protects the homeowners' collective interests" in having covenants enforced.  *Witrak*, 61 Wn. App. at 181.  Therefore, the court did not err in granting summary judgment to ESBC on this claim.

V.    CIVIL CONSPIRACY

The Pardees argue that the court erred in dismissing their claim for civil conspiracy because they have "shown evidence . . . of a conspiracy."  Appellant's Br. at 50.  We disagree.

To establish a claim for civil conspiracy, the plaintiff "must prove by clear, cogent, and convincing evidence that (1) two or more people combined to accomplish an unlawful purpose, or combined to accomplish a lawful purpose by unlawful means; and (2) the conspirators entered into an agreement to accomplish the conspiracy."  *All Star Gas, Inc. of Wash. v. Bechard*, 100 Wn. App. 732, 740, 998 P.2d 367 (2000).  But, "'[m]ere suspicion or commonality of interests is insufficient to prove a conspiracy.'"  *Bechard*, 100 Wn. App. at 740 (quoting *Wilson v. State*, 84 Wn. App. 332, 350-51, 929 P.2d 448 (1996)).  A plaintiff attempting to establish conspiracy must show that the factual circumstances are "inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy."  *John Davis & Co. v. Cedar Glen No. Four, Inc.*, 75 Wn.2d 214, 224, 450 P.2d 166 (1969).

---

[5] While principles of statutory construction are not usually used to interpret restrictive covenants, the principle is applicable here because the court's goal is to ascertain and give effect to those purposes intended by covenants.  *Riss* 131 Wn.2d at 621.

The Pardees assert that they "have shown evidence above of a conspiracy amongst the Defendants," but do not indicate which evidence supports either element of conspiracy. Appellant's Br. at 50. The only evidence in the record relevant to establishing that defendants had entered into an agreement is a declaration by a former board member stating that he was aware of at least two occasions where the board members met outside of a formal board meeting, and had seen cars belonging to some defendants parked at another defendant's residence. This evidence alone does not show circumstances inconsistent with a lawful or honest purpose and reasonably consistent only with the existence of the conspiracy. We conclude that the court did not err in granting summary judgment to the ESBC on this claim.

Concluding that the trial court did not err, we affirm.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Melnick, J.

We concur:

_____
Sutton, A.C.J.

_____
Cruser, J.